**Wilfred KEYES, et al., Plaintiffs,**

v.

**CONGRESS OF HISPANIC EDUCATORS, et al., Plaintiff–Intervenors,**

v.

**SCHOOL DISTRICT NO. 1, DENVER, COLORADO, et al., Defendants,**

and

**The State of Colorado ex rel. Gale A. Norton, Defendant–Intervenor.**

Civ. A. No. C–1499 (69–M–1499).

United States District Court, D. Colorado.

Sept. 12, 1995.

Gordon G. Greiner, Holland & Hart, Denver, CO, Norman Chachkin, New York City, for Plaintiff.

Albert H. Kauffman, Mexican American Legal Defense and Educational Fund, San Antonio, TX, Peter Roos, San Francisco, CA, for Plaintiff–Intervenors.

Michael H. Jackson, Semple & Jackson, Denver, CO, Phil C. Neal, Neal Gerber & Eisenberg, Chicago, IL, for Defendant.

William E. Thro, Assistant Attorney General, State of Colorado, Denver, CO, for Defendant–Intervenor.

## MEMORANDUM OPINION AND ORDER

MATSCH, Chief Judge.

### SUMMARY OF DECISION

Pursuant to the following detailed findings of fact and the guidance of recent United States Supreme Court opinions, it is now determined that defendant School District No. 1, Denver, Colorado, ("District") has complied in good faith with the desegregation decrees entered in this case and that the vestiges of past discrimination by the defendant have been eliminated to the extent practicable. The defendant's second motion to terminate jurisdiction is granted and full authority is restored to the District's Board of Education for governance of Denver's schools under applicable laws of the State of Colorado and the United States. This civil action is, therefore, closed with a final order of dismissal. The allegations of failure to comply with the Language Rights Consent Decree of August 17, 1984, made by plaintiff-intervenor Congress of Hispanic Educators, are removed from this civil action and will be dealt with as a separate and independent proceeding designated as Civil Action No. 95–M–2313, with its own jurisdictional base under the Equal Educational Opportunities Act of 1974, codified in 20 U.S.C. §§ 1701–1721 and particularly §§ 1703(f) and 1708.

The District filed its second motion to terminate jurisdiction on January 31, 1992. The pre-trial statements included challenges to the constitutionality of Article IX, Section 8 of the Colorado Constitution, commonly called the "Busing Clause." Upon receipt of notice, as required by 28 U.S.C. § 2403(b), the Attorney General of the State of Colorado moved to intervene as a defendant on a cross-claim and counterclaim for declaratory judgment affirming the validity of that provision. The motion to intervene was granted. The plaintiffs, plaintiff-intervenors and defendant District seek a judgment declaring the Busing Clause to be a violation of the Fourteenth Amendment of the United States Constitution. They contend that this state restriction adversely affects the District's ability to implement Resolutions 2233 and 2314, as set out in a stipulation of facts filed July 29, 1994. By adopting those resolutions, the District's Board of Education has resolved to make future changes in the current pupil assignment plan only through specified procedures after termination of this court's jurisdiction. A decision on the Busing Clause issue is necessary to guide the District upon termination of this court's jurisdiction.

In relevant part, Article IX, Section 8 of the Colorado Constitution provides:

> No sectarian tenets or doctrines shall ever be taught in the public school, nor shall any distinction or classification of pupils be made on account of race or color, nor shall any pupil be assigned or transported to any public educational institution for the purpose of achieving racial balance.

On its face this language prohibits the use of race or color as a basis for treating students differently and precludes the adoption of "racial balance" as the goal in making pupil assignments. As explained hereafter, the Busing Clause is not inconsistent with the Fourteenth Amendment of the U.S. Constitution.

### HISTORY

From 1960 to 1969, the District's Board of Education pursued a deliberate policy of racial segregation in Denver's schools. The Board actively attempted to contain what was then called the "Negro" population by keeping black families out of the Park Hill area, a residential neighborhood east of Colorado Boulevard. As a result, segregation in Denver schools was *de jure*, meaning that it was created by the deliberate acts of the governing authority. Some Board members tried to reverse these discriminatory practices, but their efforts to integrate some of the schools were repudiated in a school board election in May, 1969. This lawsuit began in June, 1969, when the original plaintiffs, children in the Denver Public Schools, challenged the constitutionality of the Board's discriminatory acts. The case has had a long history, and has been the subject of many court opinions.[1]

The District's obligation in this case has always been to remove the effects of its own past discriminatory policies. No school district has responsibility under the Constitution to eradicate the effects of racial discrimination by other agencies of government or in the larger community. *Milliken v. Bradley,* 418 U.S. 717, 738–45, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974). The United States Constitution does not burden public education with remedying all of the disadvantages experienced by racial or ethnic groups in this nation's history. There is hope that education will enlighten and energize societal efforts to relieve and redress injustice and unfairness, but the courts have neither the competence nor the power to compel public schools to make that effort.

Determining whether the District has fulfilled its constitutional obligation requires revisiting earlier decisions in this case to recall the particular discriminatory conduct that caused court intervention. The case was originally assigned to Judge William E. Doyle, who discussed the history of the District's discriminatory policies in the following passage, taken from an early *Keyes* opinion:

> Prior to 1950, the Negro population of Denver was concentrated in a portion of the city known as "Five Points," which is located west of Park Hill. Beginning in 1950, the Negro population began an eastward migration which, by 1960, had reached Colorado Boulevard, a natural di-

1. *Keyes v. School District No. 1,* 303 F.Supp. 279 (D.Colo.1969) (*"Keyes I "*), *modified,* 303 F.Supp. 289 (D.Colo.1969) (*"Keyes II "*), *order reinstated,* 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 37 (1969) (Brennan, J., in chambers) (*"Keyes III "*); *Keyes v. School Dist. No. 1,* 313 F.Supp. 61 (D.Colo. 1970) (*"Keyes IV "*); *Keyes v. School Dist. No. 1,* 313 F.Supp. 90 (D.Colo.1970) (*"Keyes V "*), *aff'd in part and rev'd in part,* 445 F.2d 990 (10th Cir.1971) (*"Keyes VI "*), *cert. granted* 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728 (1972) and *cert. denied sub. nom. School Dist. No. 1 v. Keyes,* 413 U.S. 921, 93 S.Ct. 3033, 37 L.Ed.2d 1043 (1973), *modified and remanded,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (*"Keyes VII "*), *on remand,* 368 F.Supp. 207 (D.Colo.1973) (*"Keyes VIII "*) and 380 F.Supp. 673 (D.Colo. 1974) (*"Keyes IX "*), *aff'd in part and rev'd in part,* 521 F.2d 465 (10th Cir.1975) (*"Keyes X "*), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976); *Keyes v. School Dist. No. 1,* 474 F.Supp. 1265 (D.Colo.1979) (*"Keyes XI "*); *Keyes v. School Dist. No. 1,* 540 F.Supp. 399 (D.Colo. 1982) (*"Keyes XII "*); *Keyes v. School Dist. No. 1,* 576 F.Supp. 1503 (D.Colo.1983) (*"Keyes XIII "*); *Keyes v. School Dist. No. 1,* 609 F.Supp. 1491 (D.Colo.1985) (*"Keyes XIV "*); *Keyes v. School Dist. No. 1,* No. C–1499 (D.Colo. Oct. 29, 1985) (*"Keyes XV "*) (Order for Further Proceedings); *Keyes v. School Dist. No. 1,* 653 F.Supp. 1536 (D.Colo.1987) (*"Keyes XVI "*); *Keyes v. School Dist. No. 1,* 670 F.Supp. 1513 (D.Colo.1987) (*"Keyes XVII "*), *aff'd,* 895 F.2d 659 (10th Cir. 1990) (*"Keyes XVIII "*), *cert. denied,* 498 U.S. 1082, 111 S.Ct. 951, 112 L.Ed.2d 1040 (1991).

viding line. Since 1960, this migration has extended east of Colorado Boulevard into Park Hill. . . .

Barrett Elementary School was opened in 1960 at East 29th Avenue between Jackson Street and Colorado Boulevard. The site selected for Barrett, along with the size of the school and its established boundary lines insured that it would be a segregated school from the date of its opening. . . .

Between 1960 and 1965, several boundary changes were made in the Park Hill area and mobile units were employed in some Park Hill schools to relieve overcrowding. The effect of these various acts on the racial composition of Park Hill schools was identical. Each tended to isolate and concentrate Negro students in those schools which had become segregated in the wake of Negro population influx into Park Hill while maintaining for as long as possible the Anglo status of those Park Hill schools which still remained predominantly white. . . .

[I]n 1962 a Special Study Committee on Equality of Educational Opportunity in the Denver Public Schools (Voorhees Committee) was created. Following a thorough study, the Committee recommended that the School Board consider racial, ethnic and socioeconomic factors in establishing boundaries and locating new schools, and that boundaries be set so as to establish heterogeneous school communities. Pursuant to this recommendation, the Board adopted Policy 5100, which called for changes or adaptations which would result in a more diverse or heterogeneous racial and ethnic school population.

A second study committee (Berge Committee) was established in 1966 to examine the policies of the Board with respect to the location of new schools in Northeast Denver and to suggest changes which would lead to integration of student population in Denver schools. This committee recommended that no new schools be built in Northeast Denver; that a cultural arts center be established which would be attended by students from various schools on a half-day basis once or twice a week; that

educational centers be created; and that a superior school program be initiated for Smiley and Baker junior high schools.

After more than six years of studying and discussing these committee reports and recommendations, the Board in 1968 passed the "Noel Resolution" (Resolution 1490). The "Noel Resolution" noted that Policy 5100 recognized that continuation of neighborhood schools had resulted in the concentration of minority racial and ethnic groups in some schools within the District and that these schools provided an unequal educational opportunity. The Resolution directed the Superintendent of Schools to submit to the Board a comprehensive plan for the integration of the Denver Public Schools.

Pursuant to the "Noel Resolution's" directive, the Superintendent submitted a report entitled "Planning Quality Education—A Proposal for Integrating the Denver Public Schools." Between January and April 1969, the Board studied the Superintendent's report and passed three resolutions—1520, 1524 and 1531. These Resolutions were the product of intense study and discussion and were developed only after considering some fourteen alternative plans. Basically, their purpose was to eliminate segregation in the Negro schools in Park Hill while stabilizing the racial composition of schools in transition. Thus, these Resolutions constituted the first acts of departure from the Board's prior undeviating policy of refusing to take any positive action which would bring about integration of the Park Hill schools.

In May 1969, a School Board election was held. Much of the campaign revolved around Resolutions 1520, 1524 and 1531, especially those portions which called for mandatory bussing to relieve segregation. The two candidates who had pledged to rescind Resolutions 1520, 1524 and 1531 were elected. On June 9, 1969, the three Resolutions were rescinded and in their stead the Board passed Resolution 1533, which sought to achieve desegregation on a voluntary basis. The rescissions were effectuated with little study and were justified only as a response to the community

sentiment expressed in the School Board election.

*Keyes IV,* 313 F.Supp. at 64–66.

Following evidentiary hearings and a trial on the merits, Judge Doyle found that the District had engaged in seven specific *de jure* segregative acts, each directly related to the Board's attempt to preserve predominantly white schools in Park Hill. First, the Board located a new elementary school, Barrett School, in 1960 to contain the eastward movement of the black population in northeast Denver. Second, the Board ignored study committee proposals in 1962 and 1966 for rezoning attendance areas to minimize the effects of *de facto* residential segregation. Third, the Board used mobile classrooms to accommodate overcrowding at predominantly black schools. Fourth, the Board added eight new classrooms at Hallett School to house an expanding black student body. Fifth, in 1962 and 1964, by manipulating school boundaries in Park Hill, the Board further isolated black children. Sixth, the Board staffed minority schools with disproportionately high numbers of probationary teachers, teachers with less than ten years of experience, and minority teachers. Seventh, the Board rescinded Resolutions 1520, 1524 and 1531 to perpetuate segregation in Park Hill area schools. *Keyes I,* 303 F.Supp. 279, 282–85 (D.Colo.1969); *Keyes II,* 303 F.Supp. 289, 295 (D.Colo.1969); *Keyes IV,* 313 F.Supp. 61 (D.Colo.1970).

The first court ordered desegregation plan, imposed by Judge Doyle in 1970, was limited to Park Hill area schools found to be segregated as a direct result of the District's discriminatory conduct. Judge Doyle found that the segregated conditions in areas to the west and southwest of Park Hill had also produced inferior schools with unequal educational opportunities, but this first desegregation plan was limited to the deliberately segregated Park Hill schools. *See Keyes V,* 313 F.Supp. 90 (D.Colo.1970).

On appeal, the United States Supreme Court greatly expanded the scope of this litigation by concluding that, absent the existence of natural boundaries dividing Denver into separate, unrelated units, the demonstrated deliberate segregation of Park Hill schools necessarily cast the entire school district as a segregated, "dual" system. The Supreme Court said this of Denver:

[W]here plaintiffs prove that the school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system, it is only common sense to conclude that there exists a predicate for a finding of the existence of a dual school system. Several considerations support this conclusion. First, it is obvious that a practice of concentrating Negroes in certain schools by structuring attendance zones or designating "feeder" schools on the basis of race has the reciprocal effect of keeping other nearby schools predominantly white. Similarly, the practice of building a school—such as the Barrett Elementary School in this case—to a certain size and in a certain location, "with conscious knowledge that it would be a segregated school," 303 F.Supp., at 285, has a substantial reciprocal effect on the racial composition of other nearby schools. So also, the use of mobile classrooms, the drafting of student transfer policies, the transportation of students, and the assignment of faculty and staff, on racially identifiable bases, have the clear effect of earmarking schools according to their racial composition, and this, in turn, together with the elements of student assignment and school construction, may have a profound reciprocal effect on the racial composition of residential neighborhoods within a metropolitan area, thereby causing further racial concentration within the schools.

*Keyes VII,* 413 U.S. 189, 201–02, 93 S.Ct. 2686, 2694, 37 L.Ed.2d 548 (1973).

On remand, Judge Doyle conducted a second trial and concluded:

The Supreme Court's viewpoint based on the record before it is that the Denver school system is a dual system. There can be no doubt as to its view of the case in the absence of new and cogent evidence.... Under the Court's definition it cannot be argued that within a unified school district such as that at bar there can exist conscious and knowing segregation in one

area and innocent segregation in another. The conclusion is therefore inescapable that the Denver system is a dual system within the Supreme Court's definitions. In accordance with the evidence presented and with the mandate given to us by the Supreme Court, we so conclude.

*Keyes VIII,* 368 F.Supp. 207, 210 (1973).

In 1974, Judge Doyle ordered a city-wide desegregation plan. Even that plan was found to be inadequate by the Tenth Circuit Court of Appeals in 1975. A year after remand, in March, 1976, the parties agreed upon a comprehensive remedial plan, which Judge Doyle approved.

The stipulated plan provided for pairing many elementary schools (which were divided into primary and intermediate grades), designated satellite areas, changed attendance zones and established percentage ratios of Anglo to minority students as guidelines for measuring segregation at elementary, junior high and high school levels. Requirements for operation of the District in other aspects were included. The pupil assignment portion of the plan required the transportation of many students and many of them had to ride buses for long distances.

In 1976 this case was reassigned because Judge Doyle had been appointed to the Tenth Circuit Court of Appeals. The District had requested that no changes be made in the agreed plan for three years, in the interest of stability and continuity. That request was honored. The only changes made during those three years were ones requested by the District for limited purposes at particular schools. In the following years some modifications were made at the request of the Board and the court entered certain additional orders to accommodate changing circumstances, including the racial composition of a declining student population.

In 1984 the District filed its first motion to terminate this court's jurisdiction. That motion was denied in a Memorandum Opinion and Order entered June 3, 1985, published as *Keyes XIV,* 609 F.Supp. 1491, in which the court reviewed the history of the litigation, the record of the District's compliance with the requirements of the 1974 Final Decree, as amended in 1976, and the prospects for resegregation indicated in the evidence presented at hearings held in May, 1984. At the request of all parties, the court did not order any further remedial steps for more than a year while negotiations proceeded in an effort to bring this litigation to a close with a final settlement.

After receiving notice that no settlement could be reached, the court directed further proceedings on four particular matters which had prevented a declaration of unitary status: (1) the identification of Barrett, Harrington and Mitchell elementary schools as schools for minority children, (2) the "hardship" transfer policy, (3) faculty assignments and (4) inadequate plans for implementation of Resolution 2233.

After an evidentiary hearing in March, 1986, and full briefing on the issues, a Memorandum Opinion and Order was entered on February 25, 1987, published as *Keyes XVI,* 653 F.Supp. 1536, authorizing the District to proceed with its plans to remedy the remaining vestiges of its past discriminatory policies. Alternative proposals made by the plaintiffs and plaintiff-intervenors were rejected. The assumption was that this case would follow the normal course of any action in equity, ending with entry of a final decree of permanent injunction to guide future action and protect against resegregation. Toward that end, an Interim Decree was issued on October 6, 1987, supported by another Memorandum Opinion and Order, published as *Keyes XVII,* 670 F.Supp. 1513.

That Interim Decree, superseding all prior remedial directives, gave the Board of Education considerable freedom to make changes necessary to adjust to new circumstances. In effect, it was a partial withdrawal of jurisdiction and a return of substantial authority to the Board of Education. The court recognized that the case was entering its final phase and entered the following orders directed toward the development of a final decree of permanent injunction:

1. The defendants, their agents, officers, employees and successors and all those in active concert and participation with them, are permanently enjoined from discriminating on the basis of race, color or

ethnicity in the operation of the school system. They shall continue to take action necessary to disestablish all school segregation, eliminate the effects of the former dual system and prevent resegregation.

2. The defendants are enjoined from operating schools or programs which are racially identifiable as a result of their actions. The Board is not required to maintain the current student assignment plan of attendance zones, pairings, magnet schools or programs, satellite zones and grade-level structure. Before making any changes, the Board must consider specific data showing the effect of such changes on the projected racial/ethnic composition of the student enrollment in any school affected by the proposed change. The Board must act to assure that such changes will not serve to reestablish a dual school system.

3. The constraints in paragraph 2 are applicable to future school construction and abandonment.

4. The duty imposed by the law and by this interim decree is the desegregation of schools and the maintenance of that condition. The defendants are directed to use their expertise and resources to comply with the constitutional requirement of equal educational opportunity for all who are entitled to the benefits of public education in Denver, Colorado.

5. The District retains the authority to initiate transfers for administrative reasons, including special education, bilingual education and programs to enhance voluntary integration. The defendants shall maintain an established policy to prevent the frustration, hindrance or avoidance of a District student assignment plan through parent initiated transfers and shall use administrative procedures to investigate, validate and authorize transfer requests using criteria established by the Board. If transfers are sought on grounds of "hardship," race, color or ethnicity will not be a valid basis upon which to demonstrate "hardship." The defendants shall keep records of all transfers, the reasons therefor, the race, color or ethnicity of the stu-

dent, and of the effects on the population of the transferee and transferor schools.

6. No student shall be segregated or discriminated against on account of race, color or ethnicity in any service, facility, activity, or program (including extracurricular activities) conducted or sponsored by the school in which he or she is enrolled. All school use or school-sponsored use of athletic fields, meeting rooms, and all other school related services, facilities and activities, and programs such as commencement exercises and parent-teacher meetings which are open to persons other than enrolled students, shall be open to all persons without regard to race, color or ethnicity. The District shall provide its resources, services and facilities in an equitable, nondiscriminatory manner.

7. The defendants shall maintain programs and policies designed to identify and remedy the effects of past racial segregation.

8. The defendants shall provide the transportation services necessary to satisfy the requirements of this interim decree notwithstanding the provisions of Article IX, Section 8 of the Colorado Constitution.

9(A). The principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial or ethnic composition of a staff indicate that a school is intended for minority students or anglo students.

(B). Staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color or ethnicity.

(C). Defendants are required to use an effective affirmative action plan for the hiring of minority teachers, staff and administrators with the goal of attaining a proportion which is consistent with the available labor force; the plan shall contain yearly timetables and a reasonable target date for the attainment of the affirmative action goals.

10. The District will continue to implement the provisions of the program for

limited English proficiency students heretofore approved by the Court in the Language Rights Consent Decree of August 17, 1984. Nothing in this interim decree shall modify or affect the Language Rights Consent Decree of August 17, 1984, and the prior orders entered in this case relating thereto shall remain in full force and effect.

11. It is further provided that this interim decree is binding upon he defendant Superintendent of Schools, the defendant School Board, its members, agents, servants, employees, present and future, and upon those persons in active concert or participation with them who receive actual notice of this interim decree by personal service or otherwise.

12. This interim decree, except as provided herein, shall supersede all prior injunctive orders and shall control these proceedings until the entry of a final permanent injunction.

On appeal, the Tenth Circuit Court of Appeals affirmed this court's denial of the motion to relinquish jurisdiction, based on this court's factual determination that the District had not achieved unitary status. The court of appeals, however, concluded that portions of the Interim Decree were invalid because they were not reasonably specific as required by Fed.R.Civ.P. 65(d) and merely required the District to obey the law. Accordingly, paragraph 4 was stricken and paragraphs 1 and 7 were considered to continue in effect so much of the prior injunction as required the District "to disestablish a formerly dual system" and "eliminate the effects of past racial segregation." *Keyes XVIII*, 895 F.2d 659, 668–69 (10th Cir.1990). Thus, the District was left to its own devices in completing the task of disestablishing the segregated system, and eliminating the vestiges of that system by removing the disadvantages to racial minorities resulting from it.

## ANALYSIS

Recent United States Supreme Court decisions have provided new guidance for trial courts in bringing school desegregation cases to a close. This court's assumption that this civil action would end with a final injunctive decree was removed by the Supreme Court in *Board of Education of Oklahoma City v. Dowell*, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). There the Court reversed the Tenth Circuit Court of Appeals and said that injunctive orders in school desegregation cases differ from equitable decrees in antitrust and other types of litigation. The Supreme Court directed federal district courts to close these school cases with final orders relinquishing jurisdiction and returning full governance of the schools to local control, when the defending district makes a sufficient showing that it has achieved unitary status.

Before the Supreme Court decided *Freeman v. Pitts*, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), this and other lower federal courts struggled, without much success, to try to define "unitary status." Generally, it was considered to be the opposite of the prohibited "dual system." Accordingly, the prevailing view was that courts must retain supervisory jurisdiction until the offending districts proved that all of the components of a school system, as identified in *Green v. New Kent County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), were free from racial discrimination.[2] In *Freeman*, the Supreme Court repeated the statement from *Dowell* that in the final phases of a desegregation case the district court's duties are to determine whether there has been compliance with the desegregation decree since it was entered and whether the vestiges of past discrimination were eliminated to the extent practicable, giving separate consideration to each component. The constitutional authority of the federal courts is limited to compelling the elimination of negative effects of *de jure* discrimination; it does not include the power to posit any particular affirmative achievements.

In *Freeman* and *Dowell*, the Supreme Court has reminded district courts of their duty to recognize that educational policy is to

---

**2.** The components of a school system identified in *Green* included: Faculty, Staff, Transportation, Extracurricular Activities, Facilities, and Composition of Student Body. *Green v. New Kent County School Board*, 391 U.S. 430, 435, 88 S.Ct. 1689, 1692–93, 20 L.Ed.2d 716 (1968).

be determined through the democratic process. *Freeman v. Pitts,* 503 U.S. 467, 489–90, 112 S.Ct. 1430, 1444–45, 118 L.Ed.2d 108 (1992); *Board of Education of Oklahoma City v. Dowell,* 498 U.S. 237, 247–48, 111 S.Ct. 630, 636–37, 112 L.Ed.2d 715 (1991). The Supreme Court again emphasized the limited authority of Federal courts in desegregation cases in *Missouri v. Jenkins,* —— U.S. ——, —— – ——, 115 S.Ct. 2038, 2053–56, 132 L.Ed.2d 63 (1995).

These recent Supreme Court decisions establish the standards for measuring the defendant's present position. The plaintiffs agree that the indicia of *de jure* segregation have been removed from student assignments, faculty, staff, transportation, extra curricular activities and facilities, as required by *Green,* but ask this court to retain some residual control on the ground that racial disparities in discipline, drop-out rates and participation in gifted and talented programs may be remaining vestiges of the dual system. Plaintiff-intervenors agree and add that the District has failed to recruit and hire adequate numbers of minority teachers and administrative staff under paragraph 9(C) of the Interim Decree, and has failed to advance minority administrators.

Thus, the plaintiffs and plaintiff-intervenors recommend only a partial release of jurisdiction, freeing the District from court control over pupil assignment plans and most other aspects of governance, but requiring the District to evaluate these performance disparities and propose remedies for removal of them. The plaintiff-intervenors ask for orders requiring the District to set specific goals and timetables for increased hiring of minority teachers and improving opportunities for minority faculty and staff to advance in administrative positions.

The proposal of the plaintiff-intervenors that this court retain jurisdiction and require further affirmative action in the District's employment practices goes well beyond the requirement that Denver's schools become unitary. As will be seen in the detailed findings of fact, the District has continuously made a good faith effort to comply with paragraph 9(C) and all other provisions of the Interim Decree. To now obligate the

District further would go beyond remediation of past discriminatory conduct. In the future, the District's use of race and ethnicity in employment practices will be subject to the constitutional limitations articulated by the Supreme Court in recent opinions, including *Adarand Constructors, Inc. v. Pena,* —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), and the requirements of applicable state and federal statutes.

The Supreme Court's opinion in *Missouri v. Jenkins,* —— U.S. ——, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995), defeats the plaintiffs' call for compelling additional action to investigate and redress racial disparities in student achievements and participation in special programs for gifted and talented pupils. This court has never made any findings that such differences are the result of discrimination by the District. On the contrary, ten years ago, this court said:

> [T]here is nothing in the law which does or could require equality in the results of educational services.... No school policy and no court order can assure any particular level of success in public schools any more than in any other aspect of life. Individual students will flunk, become disciplinary problems, drop out or otherwise fail to meet expectations for reasons wholly unrelated to race, ethnicity, and environment.

*Keyes XIV,* 609 F.Supp. at 1515, 1498.

The evidence received at the August, 1994, hearing does not support any finding of new discriminatory conduct as reasons for these differences in student achievement. Analysis of that evidence is contained in the detailed findings of fact that appear later in this opinion.

### THE FUTURE

█ Congress, the Colorado General Assembly and the general electorate have enacted laws having significant impacts on the operation of public schools. Many of those enactments have not been applicable to Denver schools while the District was under the supervisory jurisdiction of this court. The entry of a final order terminating jurisdiction removes the Denver District from its unique

status among Colorado school districts. Accordingly, it is now subject to the laws applicable to all of those districts, in the absence of any constitutional infirmity in them.

All parties have stipulated that substantial parts of the existing pupil assignment plan would be impacted by immediate enforcement of the Busing Clause of the Colorado Constitution. Some transportation, enrollments in the paired schools and current integration requirements for magnet/special school programs as well as voluntary integrative transfers would have to be eliminated if these prohibitions were now enforced without regard for the history of this case. Additionally, it is agreed that an inability to use transportation under the present plan would result in making some schools more than 90% minority and some more than 80% minority or white. The statutory provision authorizing denial of requests for transfers under Colorado's Public Schools of Choice Act because of an adverse effect on the desegregation plan is arguably unavailable after the order of dismissal.

The State believes that the Busing Clause permits voluntary programs not specifically designed to improve racial balance but which might have that effect at a particular school. Thus, a school in a racially unbalanced neighborhood may be designated a magnet school and children may be transported to it if they wish to attend.

The Busing Clause in the Colorado Constitution and the statutes applicable to public schools will present many challenging questions as Denver continues to provide educational opportunities in a multiracial, multicultural urban society. Future litigation may arise concerning the effect of these laws. The only question now before this court is whether the Busing Clause is incompatible with the District's duty to provide educational opportunities without racial or ethnic inequalities. The answer is no.

■ The words "integration" and "desegregation" are not synonyms. *Brown v. Board of Education* and all of its progeny hold that the Constitution prohibits segregation of races in public schools with a purpose to impose disadvantages because of race. There is no constitutional corollary requiring the mixture of races according to some formula reflecting the constituency of the community served by a single school system. Thus, *de jure* racial segregation is prohibited but racial integration is not required.

The process of changing an unconstitutionally segregated "dual" public school system into "unitary status" has often been described as integration of the schools. Race and ethnicity must necessarily be considered in the guidelines and objective criteria used to direct the process of desegregation and measure its progress. Thus, to remedy intentional segregation, a court may require that racial isolation of schools be eliminated by pupil assignments and compulsory transportation to more nearly reflect the composition of the district as a whole.

The Supreme Court in *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) considered the prohibition, contained in Title IV of the Civil Rights Act of 1964 and codified at 42 U.S.C. § 2000c–6(a), against the use of federal funds to achieve "racial balance." In *Swann* the Supreme Court observed:

> The proviso in § 2000c–6 is in terms designed to foreclose any interpretation of the Act as expanding the *existing* powers of federal courts to enforce the Equal Protection Clause. There is no suggestion of an intention to restrict those powers or withdraw from courts their historic equitable remedial powers. The legislative history of Title IV indicates that Congress was concerned that the Act might be read as creating a right of action under the Fourteenth Amendment in the situation of so-called "de facto segregation," where racial imbalance exists in the schools but with no showing that this was brought about by discriminatory action of state authorities.

*Swann*, 402 U.S. at 17–18, 91 S.Ct. at 1277 (emphasis in original).

Writing for the court, Chief Justice Burger went on to caution lower federal courts to focus their remedial powers on dismantling dual systems rather than achieving perfect racial balance. That admonition became very clear in *Pasadena City Board of Edu-*

*cation v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). In that case, the Supreme Court rejected an absolutist edict that no school could have a majority of minority students as being inconsistent with the opinion in *Swann,* rejecting the notion that there is a constitutional right to any particular degree of racial balance.

Thus, the Supreme Court has drawn a distinction between the temporary use of racial markers to remedy the effects of unlawful discrimination and the use of such racial identifiers for other governmental purposes, including educational policy.

That is consistent with the Supreme Court's interpretation of the Fourteenth Amendment in the context of other governmental action. In considering affirmative action in employment as in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) and in contracting as in *Adarand Constructors, Inc. v. Pena,* — U.S. —, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), the Supreme Court directed strict scrutiny of governmental use of racial classifications to determine whether they are justified as narrowly tailored attempts to achieve some legitimate governmental purpose. The use of racial criteria in the pupil assignment and school attendance zones plan in effect in Denver at the time of the last hearing in this case is justified because it was required to comply with the duty to remove the vestiges of the segregated system to the extent practicable.

The plaintiffs, plaintiff-intervenors and defendant contend that the Busing Clause of the Colorado Constitution is invalid under *Washington v. Seattle School District No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). There, the Supreme Court struck down a state law, enacted through an initiative, which removed from local school boards the authority to assign students to schools other than neighborhood schools. The *Washington* initiative provided:

> no school board ... shall directly or indirectly require any student to attend a school other than the school which is geographically nearest or next nearest the student's place of residence....

*Washington v. Seattle School District No. 1,* 458 U.S. at 462, 102 S.Ct. at 3190–91.

Many exceptions to that broad prohibition were authorized by the initiative, based upon such neutral factors as safety, overcrowding, inadequate facilities or programs—essentially every reason other than racial integration. The initiative was passed after the Seattle school board adopted a pupil assignment plan to integrate schools which were racially identifiable because they were in segregated neighborhoods.

The rationale of the *Washington* opinion written by Justice Blackmun was adopted from a decision by a three-judge court in *Lee v. Nyquist,* 318 F.Supp. 710 (W.D.N.Y.1970), *aff'd mem.* 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971), and an earlier Supreme Court case, *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969). Justice Blackmun wrote that those cases yielded the following central principle:

> [T]he political majority may generally restructure the political process to place obstacles in the path of everyone seeking to secure the benefits of governmental action. But a different analysis is required when the State allocates governmental power nonneutrally, by explicitly using the *racial* nature of a decision to determine the decision making process.

*Washington v. Seattle School District No. 1,* 458 U.S. at 470, 102 S.Ct. at 3195 (emphasis in original).

The *Washington* opinion does not support the broad contention that a state is barred from preventing the local adoption of voluntary integration plans to address *de facto* segregation. Rather, the *Washington* case is another step in the evolution of Equal Protection Clause jurisprudence and must be read in the context of the later cases already discussed. The constitutional restriction is on the use of governmental power, including enactments through the processes of direct democracy in the initiative and referendum, to base policy decisions on race. As read by the Supreme Court, the *Washington* initiative only prevented school boards from assigning students away from their neighborhood schools for the purpose of racial integration. Thus, the initiative had a racial

purpose. Although the Supreme Court in its *Washington* opinion did not proceed with a strict scrutiny analysis, it is obvious that the state of Washington could not justify the initiative's prohibition as a narrowly tailored attempt to advance a compelling governmental interest.

Article IX, Section 8 of the Colorado Constitution is significantly different from the *Washington* provision. The Busing Clause is preceded by a prohibition on the use of race or color in making any distinction or classification of pupils. That is entirely consistent with the Fourteenth Amendment. In the Busing Clause, the restriction on the authority to assign or transport pupils to public schools is applicable only when used "for the purpose of achieving racial balance." As previously noted, the term "racial balance" has developed a particular meaning which is presumably the intention of the Colorado electorate. Students may not be assigned or bused to schools to meet racial quotas in those schools. That is different from saying that race may never be a factor in pupil assignments.

The Colorado Attorney General recognized this limitation on the applicability of the Busing Clause in footnote 2 in the State's post-hearing brief, filed December 23, 1994, as follows:

> Enforcement of the Busing Clause does not mean an end to efforts to integrate the schools. As the State observed in its *Reply Brief,* when the Busing Clause is enforced, there will be a multitude of measures which the DPS, limited only by its creativity, could utilize to promote integration. For example, the school district, like any school district in the State, could engage or continue to engage in mandatory busing as a means of eliminating overcrowding or providing equal access to unique and innovative educational opportunities or facilities.

The Busing Clause in the Colorado Constitution is not materially different from legislative restraints imposed by Congress on the use of federal funds and the actions of federal agencies in the Equal Educational Opportunities Act of 1974, 20 U.S.C. §§ 1701–1721. There are other state and federal statutory

requirements which the District now must follow. A listing of them appears in Appendix A to this opinion. Comment on each of them is inappropriate, and this court may not give advisory opinions. It is sufficient to say that obedience to the plain language requirements of these laws materially and significantly affects the future directions of the Denver school system. They also provide protections against racially discriminatory acts. A reading of these laws demonstrates the influence and effects of the greater empowerment of minority groups that has occurred since the Supreme Court first ordered the desegregation of public schools in *Brown v. Board of Education of Topeka,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

The pupil assignment plan in effect at the time of the August, 1994 hearing does not violate the Busing Clause because it was not adopted for the purpose of achieving racial balance. It was another phase—now viewed as the final phase—in the long and difficult process of removing the vestigial effects of an unlawful policy of racial separation as ordered by this court. The plain language of the Busing Clause makes its applicability dependent upon the motivation of the Board. The Colorado Constitution does not prohibit all busing. What is prohibited is assignment and transportation of public school pupils according to a preconceived plan of racial mixture. There is nothing in the Colorado Constitution or in the other statutes which will now be in full force and effect in Denver to prohibit the Board from pursuing pluralism and racial integration as positive objectives of public education, as announced in Resolutions 2233 and 2314. The limitations are as to the means which may be used to meet those goals. Accordingly, the Board will necessarily modify some provisions in the resolutions in making future changes.

The study and monitoring called for by these resolutions may demonstrate some additional vestiges of past discrimination. All that has been determined here is that the vestiges of *de jure* segregation shown to this court have now been eliminated to the extent practicable. What is not practicable now may become so in the future and additional vestiges of past discrimination may be re-

vealed in the future. If the Board's motivation in making changes to the pupil assignment plan is to further remedy some racial disadvantage shown to have resulted from the District's past discriminatory policies, the Board may proceed with such changes so long as they are not intended to achieve some pre-determined level of racial balance.

## FINDINGS OF FACT

■ Based on the evidence received at the hearing on the District's second motion to terminate jurisdiction, the court finds that the following facts have been established.

### Good Faith Compliance With the Interim Decree

The District has complied in good faith with the Interim Decree entered by this court in 1987. That good faith compliance is demonstrated by the actions taken by the District to (1) correct the racial isolation at Barrett, Harrington, and Mitchell Elementary Schools; (2) implement and administer the Hardship Transfer Policy to prevent the use of hardship transfers to circumvent the student assignment plan; and (3) implement and administer modifications in the District's Teacher Assignment Policy.

### Racial Isolation at Barrett, Harrington and Mitchell Elementary Schools

The Board has addressed the racial isolation at Barrett, Harrington and Mitchell Elementary Schools with program innovations at those three schools as well as at the elementary schools with which those schools were paired (Cory, Ellis, and Force, respectively). Educational enhancements have included Academic Achievement Centers located at Cory, Force, and Harrington; a Montessori Program at Mitchell; a computer-assisted instructional laboratory at Barrett, Ellis, and Mitchell; a Whole Language Program at Barrett; a Mastery Learning Program at Harrington; and Highly Gifted Programs at Barrett, Cory, Ellis, and Harrington.

All three of the pairs had reduced class size in the first and second grades to personalize instruction and provide opportunities for instructional intervention early in a student's career. All three pairs have been involved in efforts to enhance the communication between the paired schools, promoting the concept of one school in two buildings. These efforts include telephone calls from the principal of the intermediate paired school to the parents of children scheduled to move to that school, visits by students attending the intermediate paired school with students at the primary paired school to discuss the positive features of the intermediate school, conducting school tours at the intermediate school for the parents of the primary paired school students, and holding shared social activities for the students from the two paired schools.

The Academic Achievement Center Program began during the summer of 1986 with a federally-funded pilot effort involving the fourth and fifth grade students at Cory, Force, and Harrington. By the 1987–1988 school year, the District was funding the three Academic Achievement Centers as well as the computer assisted instruction classes located at the three Centers' paired schools, i.e., Barrett, Mitchell, and Ellis. Prior to the 1994–1995 school year, the Academic Achievement Centers served students in grades three, four, and five who scored between the 30th and 50th percentile in reading and mathematics. At these sites, students received intensive, individualized instruction with the aid of computers. The decision to discontinue these Centers during the 1994–1995 school year was based largely on cost.

The Montessori Program established at Mitchell provides the opportunity for students age three through grade six to be guided through a curriculum that includes practical life exercises, sensory exercises, language arts, mathematics, and cultural and social studies. Specially trained teachers prepare a learning environment that promotes the students' total development. Enrollment at Mitchell has been limited on a racial/ethnic basis. The changing demographics of the District caused a change in Magnet/Special School Enrollment Guidelines for Mitchell's Montessori Program, from 50% minority and 50% white, to 60% minority and 40% white enrollment within each grade. Priority is given to students

residing within the Mitchell attendance area with eligible students in each grade being selected through a computer lottery.

Both Harrington and Barrett were selected as sites for the District's Highly Gifted Program to attract Anglo students to the schools.

These programs and educational enhancements have corrected racial isolation at Barrett, Harrington, and Mitchell without any material adverse impact on the racial balance occurring at their paired schools.

Four drive-by shooting incidents that occurred during 1992 may have influenced some decline in the percentage of Anglo students attending Harrington in the 1993–1994 school year. Harrington's efforts to become a year-round school focusing on instruction in foreign languages and multicultural education, and the completion of a new facility for Harrington on a different and significantly larger site adjacent to a spacious city park may increase Anglo enrollment at Harrington in the future.

Neither plaintiffs nor plaintiff-intervenors dispute that the District has effectively remedied student assignments at Harrington, Barrett, and Mitchell, and both agree that jurisdiction should be terminated in the area of student assignments.

### Hardship Transfer Policy

Board Policy 1226(D), approved in the February 25, 1987 Memorandum Opinion and Order published as *Keyes XVI*, 653 F.Supp. 1536, set stricter standards for the granting of parent-initiated hardship transfers and prescribed detailed procedures for implementing those standards. Under the policy, parent-initiated transfers are permitted only in instances where genuine necessity is demonstrated.

Pursuant to the policy, parent-initiated requests for transfers must be (1) timely filed, (2) supported by a statement of the race or ethnicity of the student seeking the transfer, (3) supported by an affidavit setting forth in detail the reasons why day-care arrangements are required and why a particular day-care center or other person has been selected for the needed care, (4) investigated by the principal from the student's assigned school who makes a recommendation with regard to the request, (5) reviewed by the principal of the school to which the student seeks to transfer, and (6) reviewed and finally acted upon by a member of the central administration (currently a member of the Department of Planning, Research, and Program Evaluation).

The principal from the student's assigned school must make certain that all required information has been provided and verify the location of the day care provider and the employment of the parents. If the required information cannot be verified, the request will be denied. Principals at the assigned schools will also invite parents requesting the transfer to visit the school building to discuss alternatives that would not necessitate a student transfer.

The Department of Planning, Research, and Program Evaluation reviews all parent-initiated transfers to verify the existence of genuine necessity. If the evidence shows that a parent is "shopping" for day care, the request will be denied.

Detailed records of various types of transfers (*e.g.*, daycare, administrative, medical, and program transfers) are maintained and analyzed to monitor the effects of such transfers on the enrollments at the various schools. Over time, the District has improved its record-keeping capabilities in the transfer area. Beginning in the 1987–1988 school year, the District started developing a central computerized transfer and reporting system known as "MAPPER" that became fully operational for the 1989–1990 reporting year. The development of this system further enhances the quality of transfer data available to the District for monitoring the number and the effects of transfers within the school system.

Both plaintiffs and plaintiff-intervenors admit that the District has succeeded in remedying the defects previously found in the District's transfer process, and agree that jurisdiction should be terminated in the student transfer area.

*Teacher Assignment Policy*

The District has implemented and followed the teacher assignment policy submitted at the hearings in March, 1986, and described in the February 25, 1987, opinion published as *Keyes XVI*, 653 F.Supp. at 1537–38. At the secondary level, the distribution of teachers at the beginning of each of the school years since 1986–1987 has conformed fully to the standard established in that policy. At the elementary level, the same is true for the 1986–1987, 1987–1988, 1988–1989, 1989–1990, 1990–1991, and 1991–1992 school years. In the 1992–1993 and 1993–1994 school years, a small number of schools (four each year) were outside the policy guideline. In six of these eight instances, the schools were only over or under-represented by one minority teacher.

Both plaintiffs and plaintiff-intervenors admit that the District has succeeded in remedying the previously found defects in the District's teacher assignment process and agree that jurisdiction should be terminated in the area of teacher assignments.

*Exercise of Discretion Under The Interim Decree*

The District has exercised the discretion given to it under the Interim Decree in a manner consistent with the constitutional mandate of equal educational opportunity. This is demonstrated by the School Board's adoption of Resolutions 2233 and 2314; by the District's reorganization in 1988; by the depairing of Greenlee and Traylor Elementary Schools; by the closure of Southmoor, Crofton, and Stevens Elementary Schools; by the creation of new programs at several schools; and by the District's efforts in minority faculty recruitment.

*Resolutions 2233 and 2314*

In resisting the District's motions to terminate jurisdiction, the plaintiffs and plaintiff-intervenors have argued that the history of this litigation supports continuing skepticism about the concern, commitment and capacity to achieve and maintain a unitary school system in Denver. In response, the District has relied heavily on two resolutions adopted by the District's Board of Education: Resolution 2233, adopted in April, 1984, and Resolution 2314, adopted in April, 1987.

Resolution 2233 pledges the Board in general terms to abide by the Constitution and to maintain the unitary character of the Denver Public Schools. It specifically declares the Board's intention to maintain in force the existing student assignment plan upon termination of court jurisdiction, except as changes might be made over time that are consistent with maintaining the unitary character of the District. Resolution 2233 also committed the Board to promoting "stable integrated educational opportunities." It candidly expressed the Board's intention to do so, to the extent possible, by preserving integrated neighborhood schools and establishing new ones when possibilities arose for maintaining stable integration in such schools, but only where such measures would be consistent with maintaining a unitary school district. Resolution 2233 also expressed the Board's intention to foster stable integration through voluntary measures such as additional magnet schools.

In order to report upon and monitor the implementation of Resolution 2233, an office within the school district was identified and charged with these responsibilities. Dr. Evie G. Dennis, first as Executive Director of School/Community Affairs and later as Superintendent of the District, fulfilled these duties on the District's behalf.

On an annual basis since the adoption of Resolution 2233, detailed reports have been prepared for the Board of Education that record the actions that have been taken to implement the provisions of the Resolution. Included within these reports is information that monitors the status of integration efforts at Barrett, Harrington, and Mitchell, information concerning student transfers, teacher assignments and hiring efforts, and data regarding magnet programs. Also reported is information regarding the District's efforts to assure equal educational opportunity in the area of placements in the Gifted and Talented Programs, the Highly Gifted Programs, and the Accelerated Programs, as well as efforts taken to deal with student discipline, pupil achievement, and dropouts.

Resolution 2314 was adopted to make more specific the general policies expressed in Resolution 2233 for governing decisions affecting the attendance patterns in Denver Public Schools and for maintaining the integrated character of the system. Resolution 2314 declares the Board's intention to maintain its current policy regarding teacher assignments and student transfers (Policy 1226D) and reiterates the requirement that annual reports be made to the Board regarding the status and progress of the District in maintaining a unitary school system. Resolution 2314 also articulates a specific policy to govern any future changes in attendance zones, assignments to schools, grade-level structure, and decisions associated with the closing of schools.

The policy in this regard provides:

4. The following policies shall govern any future changes in the attendance zones, assignments to schools, or grade-level structure of the student-attendance plan presently in effect:

(a) No change in such plan shall be made unless there has first been presented to the Board specific data showing the effect of such change on the projected racial/ethnic composition of the student enrollment in any school affected by the proposed change.

(b) If the projected effect of such a change would be to cause a school's minority percentage to move five (5) percentage points or more further away from the then-current districtwide average at that level (elementary, middle, or high school) than it was in the year preceding the proposed change, the change shall not be made unless:

(1) The Board determines that such change is consistent with, or will promote, the overall objective of maintaining or enhancing the stable integrated character of the District as a whole and is justified by substantial, articulated educational considerations independent of the effect on the racial/ethnic composition of the schools affected; *and*

(2) The Board determines that the educational values expected from the change are substantial enough to out-weigh the adverse effects of the proposed change on the racial/ethnic composition of the particular school or schools adversely affected; *and*

(3) The Board has given careful consideration to (i) the availability of alternative changes that might accomplish the desired educational objectives without the adverse effects on the racial/ethnic composition of the schools adversely affected; and (ii) the feasibility of additional measures to counteract or ameliorate the adverse effects, such as initiating special programs to encourage voluntary transfers that will improve the racial/ethnic composition of the affected school or schools, converting such school or schools to magnet schools, limiting new enrollment in such schools, or closing a school when it appears that no reasonably practicable measures are available to prevent a school from becoming increasingly disproportionate in its racial/ethnic composition.

Paragraph 5 of Resolution 2314 makes these principles applicable to decisions concerning school construction, closings and enlargements.

What is required by Resolution 2314's "five percent rule" is that when a District proposal is projected to adversely impact the minority enrollment at a school by five percentage points or more, then the Board must closely analyze and weigh the educational benefits of the proposal as well as the availability of more integrative alternatives.

Since the adoption of Resolution 2314 and the entry of the Interim Decree, the defendants have been faced with difficult decisions that impacted each of the areas outlined above. As is acknowledged by plaintiffs, the District has exercised the discretion given to it under the Interim Decree and has adhered to the fundamental tenets of Resolutions 2233 and 2314. This record provides some assurance that the District has the structure and methodology to provide equal educational opportunity. As has been discussed, these resolutions may require alteration because of the restrictions imposed by both state and

federal law, particularly the prohibitions on busing to achieve racial balance.

### 1988 Reorganization Plan

Beginning in the 1988–1989 school year, the District implemented a long-considered reorganization plan. The District: (i) moved grade six from the elementary schools to the middle schools, (ii) made certain changes in boundaries and feeder patterns at certain middle schools and within the Montbello area, and (iii) moved grade three in the paired schools from the primary schools to the intermediate schools.

The planning for the reorganization included gathering data regarding middle school capacities, projecting grade six through grade eight enrollments, determining staffing and curriculum needs, and studying the effects on the projected racial/ethnic composition of student enrollment in all middle and elementary schools.

Educational considerations supported the movement of sixth grade to middle schools. Among other things, it (1) permitted the reduction of class size in the first and second grades, (2) permitted an increase in the number of Early Childhood Education programs the District would be able to offer, and (3) was in line with growing research and a national trend that suggested that a grade six through grade eight middle school configuration would better meet the social, academic, emotional, and physical needs of students.

During the next school year, 1987–1988, all middle school boundaries were analyzed as part of a contemplated change to the grades six through eight middle school configuration. Certain middle school boundary changes (involving Lake, Skinner, Grant, and Merrill Middle Schools) were recommended following consideration of school capacity, educational benefits, and the racial/ethnic composition of the contemplated student bodies. Also performed as part of the study of the proposed movement of sixth graders to middle schools was an analysis of elementary school boundaries. As a result of this review, it was recommended that two elementary schools located in the Montbello area of northeast Denver (McGlone and Oakland) be depaired and new boundaries drawn which would maintain or increase racial balance.

Also recommended as part of the contemplated reorganization was that grade three in the paired schools be moved from the primary schools to the intermediate schools in order to bring about more efficient facility utilization and to permit reduced class sizes in the first and second grades. Again, projections were prepared as to the impact on the racial/ethnic composition of the affected schools.

These recommended changes were implemented during the 1988–1989 school year and, as projected, the changes did not adversely impact the racial/ethnic composition of the affected schools.

### 1991–1992 Depairing of Greenlee and Traylor Elementary Schools

During the 1989–1990 school year, the Department of Planning, Research and Program Evaluation worked with school personnel and community members to develop an enhanced university laboratory school at Greenlee Elementary School and a fundamental academy at its then-paired school, Traylor.

Since 1982, Greenlee had served as a laboratory school through its partnership with nearby Metropolitan State College. A report, submitted to the Board of Education in the fall of 1989, proposed that Greenlee and Traylor be de-paired. Three reasons were urged in support of the proposed depairing: (i) to continue as the elementary laboratory school for Metropolitan State College, Greenlee/Metro would become an Early Childhood Education, kindergarten through grade five school; with that configuration, a "State of the Art" laboratory school would be planned as a collaborative effort between the two institutions; (ii) the District's demographic analysis indicated that Traylor had sufficient numbers of minority and non-minority families within its attendance area to naturally integrate a neighborhood, kindergarten through fifth grade school; and (iii) the initiation of an Extended Day Program and an enhanced laboratory school at Greenlee/Met-

ro lab School would bring Greenlee's enrollment to at least a 25% Anglo level.

The Board requested further detailed analyses from staff and the Greenlee/Traylor communities. In December of 1990, a revised proposal was submitted to the Board. Traylor was to become a fundamental school modeled after Knight Fundamental Academy and an extended day program was to be added. These magnet programs were expected to result in Traylor's enrollment being at least 50% minority. To support the de-pairing request, staff prepared analyses of the schools' demographics, developed transfer procedures, and analyzed a questionnaire utilized to determine interest in the proposed programs.

On December 13, 1990, the Board decided to de-pair the two schools on a trial basis. Under the approved plan: (i) an extended day program was established at each of these schools; (ii) a fundamental school modeled after the successful Knight Fundamental Academy was established at Traylor on a school-within-a-school basis; and (iii) the significantly expanded laboratory school was established at Greenlee. The plan set enrollment targets (25% Anglo at Greenlee and 50% minority at Traylor) that were to be met by the close of the 1992–1993 school year to assure the preservation or enhancement of integration in the schools. The plan also provided that Greenlee and Traylor would be re-paired in the event that the targets were not met.

To promote integration, the Traylor fundamental academy program would be open to students residing west of University Boulevard in Denver, while the students living east of University Boulevard would be eligible to attend the District's other fundamental academy located at Knight Elementary School.

The programs were instituted at the two schools starting in the 1991–1992 school year. The specific enrollment targets established by the Board were met. The District's Elementary Magnet/Special School Enrollment Guidelines for the 1993–1994 school year established racial/ethnic percentage guidelines of 66.6% white and 33.3% minority at Greenlee, and 25% white and 75% minority at Traylor. The 1994–1995 guidelines establish

racial/ethnic percentage guidelines of 75% white and 25% minority at Greenlee and 25% white and 75% minority at Traylor.

### 1992 Closure of Southmoor, Crofton, and Stevens Elementary Schools

Following the passage of a bond issue to improve District facilities, the Board of Education established a Citizen's Facility Task Force to analyze, with support from District staff, the efficiency of facility utilization. Meetings were held throughout the District to study this issue and the process resulted in the identification of three geographical areas (Clusters 5, 6, and 10) where excess capacity was found to exist.

In the facility review process, criteria were developed for use in identifying the particular schools within the three geographical areas that were to be recommended for closure. The four closure criteria jointly developed by the Citizens' Facility Task Force and the District were: (i) educational efficiency and effectiveness, (ii) demographic trends and integration, (iii) neighborhood impact, and (iv) physical adequacy and cost. Specific attention in this regard was paid to the guidelines set forth in Resolutions 2233 and 2314 aimed at maintaining the integrated character of the District. Recommendations were made to the Board of Education that Southmoor, Crofton, and Stevens elementary schools be closed.

One of the proposals considered, and adopted, by the Board was the closure of Southmoor. Under the proposal: (i) Southmoor and Fairmont were to be de-paired; (ii) Fairmont was to become a neighborhood school for grades kindergarten through five; (iii) Southmoor would be closed; (iv) Southmoor's attendance area would be consolidated with that of Samuels Elementary School making it part of the existing Samuels–Cheltenham pair; (v) Satellite 13 would be reassigned to Samuels/Cheltenham; and (vi) first graders from Southmoor and from the Satellite 13 area who currently attended Fairmont would be granted the option of attending Fairmont or Cheltenham during the next school year ("Southmoor Proposal").

Enrollment projections, based on October 1991 enrollment information, were prepared as part of this proposal. The projections indicated that the affected schools (as well as the other schools within their cluster) would remain within ±15% of the districtwide elementary Anglo average (33.7%), and that, with the exception of Fairmont, each of the affected schools would move less than five percentage points away from the districtwide minority average.

Fairmont, the one school that was projected to move more than five percentage points away from the districtwide minority average, was considered to be a stably-integrated area. The change being suggested was viewed as one that would promote the integrated character of the District as a whole and provide expanded opportunities for community and parental involvement in a neighborhood school setting.

The Southmoor Proposal was adopted by the Board on May 5, 1992. Southmoor was closed and the approved changes were effectuated for the 1992–93 school year. The closure of Southmoor resulted in a strengthening of the Samuels/Cheltenham pair by modestly increasing the Anglo percentages at those schools.

No required racial or ethnic percentages were established by the Board of Education with regard to this depairing situation (in contrast with the Greenlee/Traylor situation) because Fairmont (unlike Greenlee) had been located in a stably integrated area, and thus the "risk" of the depairing was significantly lower.

The second closure proposal considered and approved by the Board was Crofton Elementary School. Under this proposal: (i) there would be a consolidation of the attendance areas of Ebert and Crofton elementary schools; (ii) the pupils in the combined attendance area would be educated at the Ebert facility; (iii) the new Crofton–Ebert school would be paired with Steele; (iv) Satellite 11 would be reassigned to this new pair; and (v) planning would proceed for the development of an enhanced educational program (a British Primary School program) to meet the education needs of the students

attending school at Crofton–Ebert and Steele (the "Crofton Proposal").

Crofton and Ebert Elementary Schools had adjoining student assignment areas. In studying the various facility options that existed, it was determined that (i) available bond dollars were not sufficient either to build a new facility or to renovate Crofton in a manner that would permit it to accommodate the projected combined student population; (ii) safety concerns existed with respect to the Crofton location because of its proximity to a new stadium; (iii) Ebert, which was a much newer and structurally sounder facility, was the only school that could accommodate the present and projected pupil population of the combined area and (iv) enrollment projections indicated that the pupil assignment changes that were being proposed would move Crofton–Ebert and Steele closer to the districtwide elementary minority percentage.

The Crofton Proposal was adopted by the Board on May 12, 1992. Crofton was closed and the approved assignment changes were effectuated for the 1992–1993 school year. Also in the 1992–1993 school year, a pilot British Primary School Program was established at Crofton–Ebert. Following the implementation of the Crofton Proposal, the racial/ethnic enrollment at each of the affected schools was within ±15% of the Anglo districtwide elementary percentage.

The third closure proposal considered and approved by the Board was Stevens Elementary School. Under the proposals that were made, (i) Stevens would be closed; (ii) Garden Place and Teller would be de-paired; (iii) a magnet program to promote integration at Garden Place would be initiated; (iv) Teller's and Steven's attendance areas would be consolidated and consideration would be given to establishing a bilingual center school program at the Teller site; and (v) certain boundary adjustments would be made in the Teller/Stevens attendance areas, consistent with the guidelines in Resolutions 2233 and 2314. These boundary changes affected Bromwell, Teller, Wyman, and Palmer Elementary Schools (the "Stevens Proposals").

Teller and Stevens had adjoining student assignment areas. In studying the facility options available, it was determined that (i)

the Stevens facility was located on an inadequate site that was less than one acre in size; (ii) the Stevens facility had physically deteriorated to the extent that its third floor had been condemned; (iii) under the proposed changes, the enrollment at Garden Place was projected to move toward the districtwide minority average; (iv) under the proposed boundary adjustments mentioned above, the enrollments at Bromwell, Wyman, and Palmer were projected to move less than five percentage points away from the districtwide minority average; and (v) Teller was projected to move more than five percentage points away from the districtwide elementary minority average, the school was projected to be within ±15% of the districtwide Anglo percentage, and consideration was to be given to the establishment of a bilingual center school that would further integrate the school.

The Board approved the Stevens proposals at meetings held on May 19, 1992 and June 24, 1992. Stevens was closed and the approved student assignment and school boundary changes described above were effectuated for the 1992–1993 school year.

At Garden Place, an International Baccalaureate Preparatory Magnet was opened to students in grades one and two during the 1992–1993 school year with additional grades to be phased into the program during subsequent years.

Enrollment guidelines established by the District limit enrollment both from within Garden Place's neighborhood area as well as from the District as a whole and set ethnic/racial enrollment limitations by grade. In the 1992–1993 school year, over 76% of the students enrolled in Garden Place's magnet program were white, and in the 1993–1994 school year, over 67% were white.

Following the approved changes, enrollments at Garden Place, Palmer, and Wyman were within ±15% of the Anglo districtwide elementary average, with Garden Place's Anglo enrollment increasing from 16.8% during the 1992–1993 school year to 18.9% during the 1993–1994 school year as further implementation of its magnet program successfully took place. The Anglo enrollments at both Teller and Bromwell were above the ±15%

guideline but Teller's Anglo enrollment has been decreasing (from 56% Anglo in 1992–1993 to 51.9% in 1993–1994) while Bromwell's Anglo percentage was almost identical to what had been projected (53.0% actual compared to 52.6% projected). Wyman's and Palmer's racial/ethnic enrollments remain very close to the elementary districtwide average.

### 1991 Establishment of School of The Arts Program at Cole Middle School

On October 2, 1990, the Board approved the establishment of a School of the Arts Program at Cole Middle School. The program was modeled after a proposal that was developed by a community committee following two years of work.

When fully implemented, the program will serve students in grades six through twelve. The program combines arts education with instruction in core academic areas. Middle school students receive their academic instruction at Cole Middle School while students in grades nine through twelve receive, or will receive, their core instruction at Manual High School. A shuttle bus is used to transport students to Cole.

The Board required that enrollment be monitored to ensure that the program has a positive impact on the integrated, unitary character of the District. Since the adoption of the program, Anglo enrollment at Cole (which before had been below the districtwide average) has increased relative to the districtwide Anglo middle school average.

### Early Childhood Education Through Eighth Grade Program at Dora Moore Elementary School

In November of 1993, the Moore Elementary School community presented a proposal to the Board to extend to students attending Moore the option of remaining at Moore through grade eight, e.g., expanding Moore to include grades six, seven, and eight ("Moore Proposal"). The educational program proposed was one that was designed not to duplicate the District's existing middle school programs. Instead, the educational emphasis was to focus on the core curriculum

with special emphasis on math and science. The concept was encouraged by studies suggesting that student outcomes are better in schools with kindergarten through eighth grade than in other, more traditional, middle-grade school structures.

The Moore Proposal was reviewed by staff and the Board in December of 1993 and January of 1994. This review included a discussion with middle school principals about the middle school model as well as a staff analysis of the projected effect of the Moore Proposal on pupil enrollment and on the racial/ethnic enrollments at the impacted schools.

Initial investigation by the staff suggested a number of areas that were of concern to the Board and to the Superintendent. These concerns included questions about the educational program that was to be offered; questions about the projected effect of the proposal on both the enrollment and the degree of racial balance at Morey Middle School, one of the middle schools that Moore attendance-area students were assigned to attend; and questions about the potential impact of the program on Moore's racial/ethnic student composition.

The District was particularly sensitive to these concerns since Moore's existing student assignment plan had been significantly impacted during the 1993–1994 school year by the closing of the North Lincoln Park Housing Project ("Lincoln Park Project"). The Lincoln Park Project was located in a satellite attendance area (Satellite 1) assigned to Moore. During the 1992–1993 school year, approximately 150 students who were living in Satellite 1 had attended Moore. Only ten percent of those students were white.

Following the announced closing of the Lincoln Park Project, Moore's Collaborative Decision–Making Committee had urged the Denver Housing Authority to find appropriate housing for the affected families within Moore's school boundaries. This was not done by the Denver Housing Authority and, in the 1993–1994 school year, most of these students had been relocated elsewhere.

While the Denver Housing Authority announced plans to rebuild the Lincoln Park

Project by 1996, great uncertainty exists in this regard. The Authority's plans have changed over time and despite efforts to obtain specific information about the construction plans, such information has not been forthcoming. It is expected that part of the housing site will be dedicated for commercial use and that there will be a reduction in the number of residential units.

One other development affected Moore's racial/ethnic student composition. Moore was designated as a bilingual zone school during the 1993–1994 school year. This designation serves to improve the integrative opportunities at Moore.

On January 20, 1994, the Board directed the staff to work with the Moore school community to develop a pilot program, for Early Childhood Education through eighth grade, that would meet the various concerns that had been raised. To that end, staff was directed to consider appropriate safeguards to deal with potential adverse impacts on the student populations at Moore and Morey in a manner consistent with the guidelines set forth in Resolutions 2233 and 2314.

After extensive work was performed by the District staff, a recommendation was made to the Board to implement a three-year pilot program at Moore beginning in the 1994–1995 school year that was consistent with the educational program proposed by the Moore community.

In analyzing the Moore Proposal, staff prepared updated projections regarding the future enrollment at both Moore and Morey for the 1994–1995 school year. These projections were made based in part on data regarding (i) students who had applied for the Moore Extended Elementary School program, a majority of whom were minority students, and (ii) students who had applied for a recent program (High Strides) that was to be offered at Morey during the 1994–1995 school year.

The updated projections were also based on different enrollment criteria than had been used earlier. The new criteria limited enrollment in the extended sixth grade to those students who attended fifth grade at Moore in the 1993–1994 school year. The

updated projections based on this new information demonstrated that enrollment levels at both schools would be increased and that the minority percentages at both schools would in each instance actually move closer to the districtwide minority average.

A number of safeguards were proposed as part of the process of monitoring the future success of the Moore Program during its three-year pilot phase. These safeguards included: (i) required annual reviews of the program that were to be prepared by the Superintendent and reported to the Board; (ii) required monitoring of the educational benefits of the program as demonstrated, *inter alia*, by achievement test results and school improvement plan results; and (iii) a commitment by the Board to take whatever action may prove necessary in the future to ensure continued adherence to the principles of Resolutions 2233 and 2314. This proposed commitment explicitly contemplated the possible discontinuation of the Moore pilot program should future circumstances so dictate.

With only one uncertainty, the updated proposal satisfactorily responded to the various concerns that had been expressed, and on April 21, 1994, the Board approved the proposed program. The one lingering issue with regard to the Moore Proposal involves the future of the children in the Lincoln Park Project should that Project be rebuilt. Satellite 1 continues to be assigned to Moore and the children remaining in that area continue to attend Moore as they did before. Should the Lincoln Park Project be rebuilt, however, it is possible that the returning Lincoln Park Project students would not all be able to be reassigned to Moore because of capacity limitations. This would depend on the number of returning Lincoln Park Project students and the number of students participating in the extended grade program should the pilot program prove to be a success.

Since it is not clear what the situation will be with regard to the Lincoln Park Project children, no concrete plans have been formulated. This situation, however, is subject to on-going monitoring by the Department of Planning, Research, and Program Evaluation as further information becomes available.

### Fundamental Middle Level Education Program at Morey Middle School

At the elementary level, Traylor and Knight Fundamental Academies have proven successful in achieving high levels of parent satisfaction and have also enhanced student performance. The number of applicants for those programs is consistently high and the students at the two schools record achievement test scores, on the Iowa Tests of Basic Skills, that are among the highest in the city.

These successes have spawned a desire to create within the District a fundamental program for grades six through eight. This interest has recently been evidenced by parental requests that Knight be allowed to add a sixth grade program at the school and by an application to establish a Denver Charter Middle School modeled after the Knight and Traylor Fundamental Academies.

In April of 1994, the Board, in recognition of the substantial parental and community support for a fundamental middle school, directed staff to work with the Fundamental Middle School Committee to establish a Fundamental Middle School for the 1994–1995 school year. As part of its charge, staff was directed to analyze the issue pursuant to the guidelines set forth in Resolutions 2233 and 2314 and to assess the potential impact of the program on other middle schools.

In May of 1994, staff reported on its findings and proposed that a fundamental middle school education program be piloted at Morey Middle School starting in the 1994–1995 school year ("Morey Program"). Morey was selected as the site of the proposed program because of the interest that was expressed by the Morey community and because it had sufficient capacity to accommodate the program. This program, like the grade extension program at Moore, was considered on its own merits.

Projections prepared by the staff indicated that under the Morey Program, Morey minority enrollment would actually move closer toward the districtwide middle school minority average. Safeguards recommended by the staff for the Morey Program included (i) establishing enrollment guidelines of up to

60% minority and from 40% to 50% white for each grade (with priority for one-half of the available sixth grade openings being given to fifth grade fundamental students at Knight and Traylor), (ii) monitoring the impact on the racial/ethnic enrollment at both the sending and receiving schools, (iii) evaluating the positive educational benefits flowing from the fundamental program, and (iv) requiring annual reports by the Superintendent on the success and effect of the program.

In response to Board questioning, staff specified that one of the safeguards that could prove necessary in the future was the establishment of enrollment restrictions in the event other middle schools were adversely impacted by Morey Program transfers. The proposal was approved by the Board on May 19, 1994.

### Proposed School of the Arts Program at Gilpin Elementary School

Since the early 1980's Gilpin has operated as a self-supporting extended day magnet school. For many years, the extended day magnet succeeded in drawing a substantial number of Anglos to attend Gilpin. In recent years, however, the growing need for extended day programs and the increasing efforts by community schools to become more financially self-sufficient in the face of increasing budgetary constraints has given rise to a proliferation in the number of extended day programs being offered within the District. The number of programs grew from one as recently as 1990–1991, to four in 1991–1992, to twenty in 1993–1994. With the expansion in the supply of these needed programs, there has been a marked reduction in the number of Anglo students availing themselves of Gilpin's extended day offering.

The District, in addressing the changing situation at Gilpin, has undertaken specific remedial steps, including: (i) restricting Anglo students from Gilpin from attending other magnet programs; (ii) attempting to transfer bilingual students to bilingual zone schools other than Gilpin (*e.g.*, to Moore that has a higher Anglo percentage); and (iii) deciding to prohibit students from transferring from their assigned school to any District school other than Gilpin for their extended day needs.

The District has also encouraged the Gilpin community and its Collaborative Decision–Making Committee to work with the District staff in developing a new magnet program that will succeed over the long term in drawing additional Anglo students to this school that is strategically located in downtown Denver. One concept being discussed and developed is an elementary school of the arts magnet that could be coordinated with the recently adopted school of the arts program at Cole Middle School.

### Minority Faculty Recruitment

■ The initial complaint filed in this case did not allege discrimination by the District in the hiring of employees. Instead, allegations were made that the District had assigned teachers in a manner that had contributed to the racial identifiability of certain schools.

In 1974, the Court ordered implementation of a program for the recruitment of minority teachers that was in substance the recruitment program contained in the District's own desegregation plan that had been submitted to the court. As a goal, the court ordered the District to achieve ratios of Hispanic and Black personnel to Anglo that reflected more truly the ratios of Hispanic and Black students to Anglo students in the District. This order was affirmed in 1975 by the Tenth Circuit Court of Appeals. *Keyes X,* 521 F.2d 465, 484 (10th Cir.1975).

In October of 1987, this court, in light of the Supreme Court's decision in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), ordered as part of its new Interim Decree that the District use as its recruitment goal a proportion of minority to Anglo faculty that was consistent with the available labor pool as opposed to the old standard that was based on the student racial/ethnic membership. See *Keyes XVII,* 670 F.Supp. at 1517. In other words, the goal was ordered changed from one based on minority student membership to one based on the available labor pool.

Since the entry of the Interim Decree, the District has made efforts to recruit and hire minority teachers and minority administrators. These efforts have been restrained by two market realities. First, the available labor pool of minority teachers—especially minority teachers in high-need areas such as bilingual education, math, science, special education, and computer education and programming—is smaller than is the growing percentage of minority student membership in the District. Second, on a relative basis, there appear to be more opportunities for minority candidates in professions other than teaching and educational administration, thus further depleting the available labor pool.

Plaintiffs and plaintiff-intervenors have raised a number of criticisms with regard to the District's minority teacher recruitment effort. These criticisms include: (i) the District's failure to meet the hiring "goals" once contained in its affirmative action reports, (ii) the District's failure to conduct any out-of-state recruiting trips in 1992 even though the District lost a significant number of Black teachers as a result of its early retirement program that year; (iii) the District's failure to recruit at enough of the top fifty institutions that are "producing" the greatest number of Black and Hispanic teaching candidates; (iv) the District's failure to increase the percentage of Hispanic faculty to meet the increase in the Hispanic student membership percentage; (v) the District's failure to act quickly enough to finalize minority contract offers; and (vi) the District's failure to establish numerical goals and timetables for the hiring of additional Black and Hispanic faculty members.

As to the criticisms about the District's failure to meet the "goals" once contained in its affirmative action reports, the "goals" that are referred to in this regard are the old, historical goals that were based on the percentage of Hispanic and Black student membership, not "goals" based on the available labor force. These were the goals that the court ordered be eliminated in 1987 and replaced with goals based on the available labor force. *Keyes XVII,* 670 F.Supp. at 1517. The District's "failure" to meet these historical goals is not determinative of whether the District has complied in good faith with the Interim Decree. The proper inquiry is whether the District has met the available labor force goal.

The most significant sources for new teachers (minority and otherwise) for the District are the institutions of higher education located within the State of Colorado. More particularly, these primary sources of "supply" have included Metropolitan State College, the University of Northern Colorado, the University of Southern Colorado, and Adams State College.

Focusing on the State of Colorado as the relevant available labor pool, and comparing the pool of Hispanic and Black teachers contained within that area to the percentages of Black and Hispanic teachers employed by the District, it is clear that the District has achieved minority faculty percentages that far exceed those that exist in the available labor pool. For Blacks, the Colorado labor pool is approximately 2.5%, while the District's percentage of Black teachers from 1985 through 1993 ranges from 13.4% to 8.7%. For Hispanics, the Colorado labor pool ranges from 5.7% to 6.7% while the District's percentage of Hispanic teachers for 1985 through 1993 has increased from 10.3% to 12.7%. Similar results are obtained by comparing the District's minority faculty percentages to a labor pool consisting of the Denver Consolidated Metropolitan Area.

If instead of looking at the existing percentages of Black and Hispanic teachers within the District, a comparison is made to the percent of Black and Hispanic new hires each year, the result is fundamentally the same, *e.g.,* the percent of minority new hires made by the District each year is generally well in excess of the Colorado labor pool.

Further demonstration of the fact that the District's hiring of Black and Hispanic teachers meets the available labor force standard is found in comparing the District's new hires of Black and Hispanic teachers with the pool of Blacks and Hispanics receiving bachelor degrees in the State of Colorado. This comparison demonstrates that the District's percentage of Black and Hispanic new hires on an annual basis is far in excess of the per-

centage of Blacks and Hispanics receiving bachelor degrees in Colorado.

Final confirmation of the fact that the District has succeeded in meeting the available labor pool standard is found by comparing the District's yearly new hires of Black and Hispanic teachers with the percentage of Blacks and Hispanics receiving education bachelor degrees within the entire United States, as well as with the percentage receiving all bachelor degrees within the United States. This comparison shows that the District's percentage of new Hispanic hires on an annual basis far exceeds the percentages of Hispanics within the United States who receive education bachelor degrees, and all bachelor degrees. Similarly, the District's percentage of new Black faculty hires on a yearly basis in most instances exceeds the percentages of Blacks within the United States who receive education bachelor degrees, and all bachelor degrees.

Plaintiffs and plaintiff-intervenors suggest that the relevant labor pool may be something different, such as one composed of undefined "large urban districts" or "urban districts that have 70 percent or more minority students." Plaintiffs and plaintiff-intervenors have failed to submit any evidence regarding what these available labor pool figures are and offer no evidence to suggest that the numbers for those labor pools would differ from the various labor pool measures discussed above.

Plaintiffs' and plaintiff-intervenors' further criticism of the District for its decision not to conduct any out-of-state recruiting trips in 1992 does not adequately consider the District's overall recruiting effort as well as the actual circumstances that faced the District in 1992. While it is true that the District has in the past actively recruited out-of-state, current circumstances make it reasonable to conclude that out-of-state recruitment need not be emphasized now. The District's experience has shown that only limited success flows from the making of such costly out-of-state efforts.

In addition, out-of-state recruitment is only one facet of the District's recruitment efforts. Other components, which are continuing, involve in-state recruiting visits to certain Col-

orado institutions of higher education; work with the various District Advisory Councils (Black, Asian, Hispanic, and Native American) to discuss recruitment strategies and the identification of minority candidates; the production of a recruitment video tape that is sent to a large number of the universities that graduate the greatest number of minority candidates; the placement of ads in appropriate journals and the preparation of postings for all Denver Public School buildings; the establishment of a $300,000 Paraprofessional Trust Fund to be used by District paraprofessionals as a means of encouraging and enabling them to obtain the required teacher training; the setting-up of recruiting booths at meetings of the National Association for Black School Educators and the National Association for Bilingual Educators; the establishment of the program known as "Todays Students, Tomorrows Teachers" at each of the District's ten high schools to encourage students to enter the teaching profession; work with the "Recruiting New Teachers Project" located in New York City to identify minority teachers; and participation in various job fairs and conferences such as those provided by the Urban League.

The decision by the District not to do any out-of-state recruiting trips in 1992 is reasonable under a cost/benefit analysis. The decision was reached at a time when it was believed that the District would lose some 600 employees as a result of its early retirement plan and that there would be only a limited need to replace the teachers that would be lost. It was in the face of this reality—and the reality of a potential $30 million to $50 million District budget deficit—that the decision to forego expensive out-of-state recruiting for one year was made.

Significantly more teachers retired than had been anticipated and the District also was faced with an unexpected increase in student enrollment. The District was thus required to hire more teachers than it had anticipated, but this turn of events was not foreseeable.

At the time the decision was reached, the Board was fully cognizant of the declining

number of minority faculty members that were being attracted to the District and directed that the Superintendent and her staff focus on ways to enhance its minority recruitment efforts. Since that time, out-of-state recruitment visits have again been made to institutions where such efforts are viewed to have the greatest chance of success. The trips have included visits to New Mexico State University, the University of Texas at El Paso, and the University of New Mexico.

Similarly, as to the criticism that the District has failed to recruit at enough of the "Top 50" institutions "producing" Black and Hispanic teaching candidates, the District's experience has shown only limited success in its efforts to recruit at those schools and the District continues to engage in the full range of recruiting activities that are described above that aim at enhancing minority hiring. These steps include personal visits to some of these "Top 50" producers (*e.g.,* Metropolitan State College, the University of Northern Colorado, the University of Texas at El Paso and the University of New Mexico) as well as sending a District recruitment video tape to between 50 and 100 of those institutions. In addition, distribution of copies of the *Black Collegian* magazine, which lists the District as one of the top 100 employers of Black candidates, is made to Black college students across the nation.

The criticism that the District has failed to increase the percentage of Hispanic faculty to meet the increase in the Hispanic student percentage overlooks the fact that the relevant goal is the available labor pool—not the student minority membership percentage—and that the District has more than succeeded in meeting the relevant labor pool goal. It also ignores the fact that while role models are beneficial, a person can be a truly effective teacher for minority children regardless of his or her race or gender.

The District has taken steps to expedite the contract process and the District has hired at rates that exceed those available in the relevant labor pool.

The criticism of the District's failure to have established numerical goals and timetables for expanded Black and Hispanic faculty hiring ignores the fact that the District for a substantial period of time has met or exceeded the available labor pool and that the District continues to make every reasonable effort "to increase the proportion of minority teachers"—as is provided for by Resolution 2314—by taking all reasonable steps to identify and recruit qualified minority applicants. To set numerical goals in excess of the available labor pool is neither necessary nor appropriate. Instead, the District has properly made minority recruitment one of its ongoing priorities and has taken reasonable steps to advance that effort.

### Changes in Top Administrators

Regarding administrative personnel, the plaintiff-intervenors raised at the hearing a concern that recent changes in certain "Top Administrators" within the District may lead to a decrease in the level of responsibilities assigned to minority administrators. The new Superintendent for the 1994–1995 school year is Anglo replacing Dr. Dennis, a Black. The next highest administrative (non-financial) positions in the District include an Hispanic Associate Superintendent and three Assistant Superintendents who are Hispanic, Black, and Anglo. The highest ranking financial administrators will be the Chief Operating Officer who is Anglo and his assistant (who will also act as the head of human resources) who is Hispanic. There is no evidence to suggest that the level of responsibility assigned to minority administrators will be adversely effected by these changes in the District's top administrators.

*Presently Existing Racial/Ethnic Differences in Program Participation, Test Scores and Discipline Are Not Vestiges of Segregation*

■ The evidence presents disturbing racial/ethnic differences in participation in the District's Gifted and Talented, Highly Gifted, and Accelerated Course Programs; differences in the racial/ethnic student composition of different classrooms located within particular schools; racial/ethnic differences in discipline; racial/ethnic differences with regard to dropout rates and achievement; and racial/ethnic differences in the composition of

certain schools' Collaborative Decision–Making Committees.

These differences are longstanding and seemingly intractable. The mere existence of such differences does not identify them as vestiges from the dual system existing twenty-five years ago. There are too many variables, including societal and socio-economic factors, to infer causation from prior unconstitutional conduct.

The District has shown awareness and sensitivity to these differences. Recognizing that public education is carried on by the interaction of human beings with frailties within the human dynamics of an often stressful environment, school officials have an obligation to monitor and attend to indications that unfairness or disadvantages may reflect bias, prejudice or indifference. As observed, the statutes under which schools operate impose requirements beyond the remediation authority of this court.

### Gifted and Talented Program

The District continues to provide its students with Gifted and Talented programs at all grade levels. The definitions of gifted and talented programs and students used by the District are the definitions utilized by the Office of Civil Rights.

The District's Gifted and Talented Office works with school principals to encourage minority student participation in Gifted and Talented classes. The goal is to take all practicable steps to insure the identification of all children who are expected to benefit from participation in the program.

The District over the years has continued to improve its identification procedures to increase the participation of minority children in the Gifted and Talented programs. In identifying "giftedness," many techniques are used. They include: teacher checklists, parent inventories, pupil self-nomination, peer nomination, special teacher nomination, achievement test scores, Structure of Intellect scores, Circles Test of Creativity, interviews, and the Raven's Standard Progressive Matrices Test. Over time there has been an increase in the percentage of minority students participating in the District's Gifted and Talented Program.

The District took the step of providing for a half-time teacher for the Gifted and Talented program in each elementary school that has grades three through five. At each middle school, a Gifted Education Specialist is in place to improve the placement of more minority students through cluster grouping, compacting curriculum, enrichment, and counseling.

The effects of these steps on the numbers of participants and their racial/ethnic breakdowns are continually monitored by the District and reported in the annual Resolution 2233 Reports that are prepared for the Board of Education.

Comparative information regarding racial/ethnic participation in Gifted and Talented Programs in the State of Colorado and in the entire United States shows that the District's experience in this regard is comparable. In fact, while Black and Hispanic students from the District comprise, respectively, about 44% and 25% of all the Black and Hispanic students within the state of Colorado, they constitute 69% and 44%, respectively, of the participants in the state's Gifted and Talented Programs.

The racial/ethnic differences that do exist are not causally connected to the prior constitutional violation found in this case.

### Highly Gifted Program

In addition to the services afforded to elementary and middle school students under the District's Gifted and Talented Program, educational opportunities above and beyond those normally provided to the gifted and talented are offered to those elementary and middle school pupils identified as highly gifted under the District's Highly Gifted Magnet Program. The overall number of students participating in this program is relatively small (*e.g.*, in 1992–1993 the program served 573 (1.2%) of the over 45,000 total elementary and middle school students).

In the elementary program, pupils are served in either self-contained classrooms or are served with regular students, as well as other highly gifted students, in Challenge

Team Classrooms. During the 1992–1993 school year, Challenge Team Classrooms were in place at seven elementary schools located throughout the District (Barrett, Bradley, Columbine, Cory, Gust, McGlone, and McMeen) and the self-contained classroom program was operating at five elementary schools (Columbine, Ellis, Harrington, University Park, and Wyman). The assignment at Wyman was a temporary arrangement to serve some of Harrington's highly gifted students while Harrington's new facility was being constructed. With the completion of that building in January, 1994, those students were once again reassigned to Harrington.

The students assigned to the self-contained highly gifted program are not separated from the other students for the entire academic day. They are integrated into the general school population for such activities as gym, lunch, and playground and are academically mixed for science and social studies as well as for certain study units such as those involving specific topics such as China or Cinco de Mayo Day.

A highly gifted component was added to the middle schools in the 1988–1989 school year to provide continuity with the elementary program. Identified highly gifted middle school students are served in teams that include both highly gifted and regular students. During the 1992–1993 school year, highly gifted programs were in place at four middle schools (Baker, Mann, Place, and Smiley).

The District has consistently monitored the racial/ethnic backgrounds of the students enrolled in the program and has tried to improve the identification process to increase the number of minority students participating. Such efforts at individual schools include making parents aware of the availability of the program and encouraging teachers to recommend minority students for possible inclusion in the program.

As with the Gifted and Talented Program, no single criterion is used to determine eligibility. In an effort to increase the number of minorities in the program, the use of the Raven's Standard Progressive Matrices Test has been expanded to earlier grades to lessen reliance on parent and teacher nomination.

In addition to the educational enhancements offered by the program, an additional positive effect of the Highly Gifted Program at the elementary and middle school levels has been its use in effectuating student assignments to center or cluster locations in a manner that has furthered the integration of those schools. This was the case, for example, in the selection of Harrington and Barrett as two of the highly gifted program sites.

The District's management of the Highly Gifted Program shows sensitivity to the issue of minority participation, an ongoing effort to encourage it and a constant monitoring of the placement results. The existing disparities in the program are not results of the prior constitutional violation.

### Accelerated Courses

In May of 1984, the Board of Education was presented with an Affirmative Student Placement Plan focused on ensuring appropriate placement of high school students with high academic potential who had not selected, or had not been counseled into, accelerated courses.

The approved plan directed each high school to assemble a group of teachers and counselors who would follow the guidelines of the plan. This committee was to work with the faculty in identifying, recruiting, placing, and supporting students who could find success in more challenging classes. Under the plan, combined efforts among school staff, parents, community, and students were made to increase the numbers of minorities participating in accelerated classes.

Efforts to identify minority students not identified by traditional means for participation in the District's accelerated courses include the use of the Mill Hill Vocabulary Scale and the Raven's Standard Progressive Matrices Test. Other components of the identification process include selected parts of the Structure of Intellect Scores, grade point average, Iowa Test of Basic Skills, a writing sample, an aptitude instrument, par-

ent, peer and self-nominations, attendance, and a student interview.

At Manual High School—a high school singled out by the plaintiffs and plaintiff-intervenors for particular concern in this regard—students have the ability to self-select the higher level or accelerated courses they want to take. Even for the upper level courses offered to juniors or seniors where course prerequisites exist, the school will in some instances grant waivers to permit enrollment of students wishing to take advantage of the accelerated class offerings.

Minority high school students, such as those at Manual, are encouraged to enroll in accelerated courses. This encouragement takes many forms including actions taken by counselors and teachers to encourage students to revise their choice of studies selections to take more accelerated courses for college admission purposes; requiring all high school freshmen to take a Commitment to Excellence Study Skills class to help students understand the District's graduation requirements and to help them prepare for life after high school; offering a second class period of instruction in accelerated English to help students who had not been identified as gifted in the past to successfully complete this accelerated course offering; sponsoring a program for parents that informs parents of the accelerated course opportunities available to their children and encourages the parents to work with their children in order to increase their participation and encouraging minority students already participating in those programs to work with other minority students in an effort to increase enrollment.

Encouraging minority participation in the accelerated courses is a difficult task given the socioeconomic realities that exist and the peer pressure that is placed on minority students to turn their backs on the accelerated course offerings that are available.

The effects of these steps on the numbers of participants in accelerated courses and their racial/ethnic breakdowns are continually monitored by the District and reported in the annual Resolution 2233 Reports prepared for the Board of Education.

The District's efforts in the accelerated course program show an awareness of the existing disparities in the racial/ethnic placements and a continuing effort to reduce these disparities to the extent practicable. The disparities that do exist are not causally connected to the prior constitutional violation found in this case.

*Classroom Assignments*

There is a concern about differences that exist in the racial/ethnic composition of different classrooms located within certain schools.

At the elementary level, individual class lists for the different classrooms are prepared by school personnel after looking at the total range of student characteristics, *e.g.,* race/ethnicity, gender, bilingual needs, Chapter 1 needs, and Special Education needs. As part of the classroom assignment process at the paired schools, teachers from the primary paired school and the intermediate paired school meet to discuss the needs of the various students who will be moving from one building site to the other.

Differences in the racial/ethnic composition of the different classrooms within a school can be the result of a number of factors. These factors include the variety of programs being offered at the school (*e.g.,* bilingual program classrooms are often assigned a larger number of minority children while highly gifted classrooms often receive a larger number of Anglo students), the mobility of the student body, and the grade mix. This problem is further exacerbated by the small number of students attending some of the elementary schools. For example, at Barrett, the difference of one Anglo student can change the Anglo percentage of a single classroom by five percentage points.

At the high schools, students complete requests for their choice of studies that must be signed by the student's parent or guardian. The schedules for students are then prepared by computer based on these selections. Again, differences in the racial/ethnic composition of different classrooms can be created by program offerings and by student interest in particular courses (*e.g.,* 100%

Black enrollment in an African–American Literature Class).

As discussed above, the racial/ethnic disparities in classroom assignments that exist are not the result of discriminatory action or flawed assignment processes or procedures. Instead, the differences result from practical considerations such as program differences, differences in the needs of different groups of students, and student choice. These disparities in classroom assignment are not causally connected to the prior constitutional violation found in this case.

### Discipline

Discipline within the District has been and remains one of the most difficult problems. While discipline ten years ago involved incidents of inappropriate behavior and adolescent acting-out, today's actions by students frequently involve gang related activities and criminal conduct such as the use of drugs, the possession of concealed weapons, and the commission of serious acts of violence. In this, the schools reflect what is happening in the larger society.

Discipline policies previously considered by the court remained in effect until January 14, 1995. Since that date, a new District policy regulating student conduct and discipline (dictated in part by Colorado state law) has been in place and the District has worked to involve the parents in its implementation.

The District periodically prepares and analyzes extensive records regarding discipline. In this regard the District has been sensitive to the issue of the suspensions of Black students.

Each school receives yearly a five-year summary of suspensions, and summaries of that data are provided to the Board and included within the Resolution 2233 Reports. Monthly reports on expulsions are provided to members of the Board, and individuals from central administration who supervise the performance of school principals receive compilations of statistical data regarding suspensions as well as information regarding any trends shown in the relevant statistical information. The principal's performance in providing and promoting a safe, orderly environment for learning constitutes part of his or her formal appraisal process.

District efforts to deal with disciplinary problems at the elementary and secondary level include the use of in-school suspensions as an alternative to out-of-school suspensions so students are not entirely removed from the educational setting; the creation of mentoring programs to provide counseling to students; the institution of a "closed campus" policy at North High School; the development of alternatives to suspensions including Saturday school, after-school detention, in-school work detail, and site-based managed summer schools; the initiation of programs at certain high schools to "adopt" incoming ninth-grade students; the institution of mandatory parent conferences that also include the student, the counselor, the advisor, and a member of the administration; conducting workshops for elementary principals, teachers, and parents on District discipline policy, procedures, due process, and positive discipline; on-going staff development programs at the site level to address discipline issues; and, at the middle schools, the increased use of parent/teacher conferences and the referral ladder, the utilization of after-school tutoring, and parental involvement in classes while the student is on suspension. Different schools adopt different approaches to deal with the particular discipline setting that is present.

In general, the statistics on suspensions demonstrate that the percentage of Hispanic suspensions at the elementary and high school levels has been less than or approximately equal to the percentage of Hispanic membership in the student population at those grade levels. At the middle school level, the percentage of Hispanic student suspensions has been somewhat higher than the percentage of Hispanic membership in the middle school population. The same comparison for Anglos and Blacks shows that, at each grade level, Anglo suspension percentages are less than their percentage membership while Black suspension percentages are greater than their percentage membership.

The District's data in terms of the proportion of Hispanic and Black students suspended out-of-school versus their respective pro-

portions in student membership is favorable when compared with the comparable information for the State of Colorado and the United States.

The District is sensitive to and interested in the issue of discipline. The Board seeks to be assured of an even-handed application of the discipline policy. If a student's conduct violates the discipline policy, it is expected that he or she will be disciplined regardless of the potential disparate effect on the racial/ethnic statistics.

The racial/ethnic disparities that do exist in the area of discipline are not causally connected to the prior constitutional violation found in this case.

*Dropout Prevention*

The subject of dropout prevention continues to receive close scrutiny from the District. During the 1985–1986 school year, "Dropout Analysis Reports" for "at risk" children were prepared and a "Dropout Prevention Review" of the alternative education programs at the Alternative Learning Center and the Metropolitan Youth Education Center were performed.

Over the years, a number of strategies have been developed and implemented in an effort to reduce the numbers of "at risk" students. These efforts have included the development of school-by-school transitional plans for eighth grade students by all middle schools and high schools; the initiation of a Partners in Education tutoring program; the holding of dropout workshops coordinated by the District's Dropout Prevention office; the use of federal funds to implement dropout prevention programs at certain elementary schools such as Cheltenham, Fairview, Fairmont, Smith, Smedley, and Munroe; the initiation of a Homework Hotline Program; the initiation of a teen pregnancy program; the development of a pilot summer program providing remedial academic instruction as well as the opportunity to participate in community and recreation programs; the implementation of a night school option for "at risk" students at certain high schools; the enrollment of "at risk" students in the Second Chance Program at Opportunity High School; the opening of Redirection High School to meet the needs of "at risk" students and, in addition, the adoption at traditional high schools of programs such as the School–to–Work Action Program, the Anchors Program, the Cluster Program, the Lincoln Alternative Mastery Program, the College Path Scholarship Program, and the Entry Employment Experience Program.

Other programs designed, in part, to deal with the question of dropout prevention include the seven Family Resource Schools that have been established to encourage parents and students to become more involved in their schools and the Efficacy Program implemented in all of the Montbello-area schools.

The Efficacy Program involves a process of instruction that is specifically aimed at improving achievement in schools with a significant number of minority students. It has produced positive results at other school districts in which it has been implemented and its success in the District could lead to enhanced achievement and an improvement in the dropout situation.

Dropout prevention increasingly is being viewed as a kindergarten through grade twelve issue rather than one that is limited to the high schools. In that regard, efforts are being made by the District to redirect funding from the higher grade levels for use at the lower grade levels.

One of the primary devices being utilized by the District to reduce the number of dropouts and to aid student achievement is the increased implementation of Early Childhood Education ("ECE") programs for four-year olds at the elementary schools. The District's increased use of these programs is demonstrated by the fact that for the 1986–1987 school year approximately only 1,000 students were participating in ECE Programs, while in 1993–1994, that number had risen to over 2,400 children. Additional ECE programs are being implemented in the District supported by funding from the District, the State of Colorado, and the federal government.

The District compiles and makes available statistics regarding dropout rates and completer rates. This information again is in-

cluded in the annual Resolution 2233 Reports that are prepared for the Board.

The percentage of dropouts who are Hispanic has been greater than the Hispanic percentage of the high school population. The percentage of Black student dropouts has been at or near the percentage of Blacks in the District's high schools. For Whites, the dropout percentage has been lower than their percentage membership in the high school population. Data regarding the number of dropouts who in fact return to school to complete their education ("adjustments") demonstrate that Hispanics constitute by far the largest number of returning students.

The District's efforts in the dropout prevention area show that the District is aware of the existing disparities in dropout rates and completer rates on a racial/ethnic basis, is continuing to take steps to reduce those disparities to the extent it is practicable, and is actively monitoring the effects of those efforts. The present racial/ethnic disparities that do exist are not causally connected to the prior constitutional violation.

### Achievement

During the 1986–1987 school year, the Board developed a new mission statement that highlighted increased achievement of all the District's students as its fundamental concern. Major goals established to accomplish this objective included improving achievement in language arts as well as developing a comprehensive plan to address the issue of achievement, with special emphasis on the achievement of minority students.

Throughout the 1989–1990 school year, the District's human relations monitoring staff observed several innovations in instructional practices and methodologies in an attempt to help schools close the achievement gap between Anglo and minority students. Among the innovative instructional practices investigated were the use of a whole language approach to reading instruction, the use of cooperative learning techniques, and the utilization of discovery learning. These programs, in combination with regular instruction, did not reduce the achievement gap between Anglo and minority students on the Iowa Tests of Basic Skills.

Current District efforts to improve achievement have been a primary focus of the District's strategic plan that is updated each year. The strategies being pursued in this regard include (i) defining student achievement and ensuring growth through comprehensive diagnosis, prescription, instruction and assessment; (ii) developing curriculum that includes high expectations and built-in standards to provide schools a variety of options with which to meet the needs, interests, and abilities of the District's diverse student population; (iii) developing instructional programs and options to encourage and support the emergence of new forms of schooling and excellence; and (iv) developing schoolwide systems to mitigate the negative effects of mobility on students and student achievement.

The District succeeded in introducing a completely revised curriculum designed to meet current student needs particularly those arising in technological and information-gathering fields.

A plan for organizing the District's schools into ten clusters was developed. Each cluster is a vertical collection of schools that includes one or more schools at each of the three levels (elementary, middle school, and high school). This plan was instituted to promote accountability, to provide for more effective communication between the schools and the central office, and to provide a more effective means to address education concerns including achievement.

Two other key elements in the District's efforts to promote achievement are the increased use of Early Childhood Education programs at the District's elementary schools and the implementation of the Efficacy Program within the Montbello-area.

Information about the achievement levels of the District's students and the racial/ethnic disparities that exist are collected and analyzed, and summaries are reported in the Resolution 2233 Reports prepared for the Board.

Part of the appraisal process for the District's principals involves assessment of the achievement record at the principal's school

and a review of how well the principal is doing in meeting his or her achievement goals. District administrators receive only a one-year contract and poor performance in this regard can lead to the principal's removal.

As is common in other large, urban school districts, gaps exist between the achievement levels of Anglo and minority students. During recent years there has been some movement in narrowing those existing gaps at the various grade levels. Even though gaps do exist, there is insufficient evidence to find that these differences are the result of discriminatory attitudes or practices on the part of the District.

Additional evidence regarding student achievement within the District comes from ACT and SAT test results. These data show that minority students within the District taking the ACT and SAT tests have obtained results that are comparable, and in many instances, superior, to the results obtained by minority students nationwide.

The District entered into an enterprise contract with the State of Colorado as part of the State's accreditation process. Under this arrangement, a six-year period of accreditation is undertaken in which the District is committed to realize certain goals that include improved graduation and achievement rates. The District reports its progress (or lack thereof) in these areas to the State and is accountable for its outcomes. If its goals are not met, the District risks a loss of accreditation.

The District's efforts in the achievement area demonstrate that the District is aware of existing disparities in racial/ethnic achievement results, is continuing to take steps to reduce those disparities to the extent practicable and is actively monitoring the effects of those efforts. Current disparities between Anglo and minority achievement are not the result of discriminatory attitudes or practices on the part of the District and are not causally connected to the prior constitutional violation found in this case.

### Collaborative Decision–Making Committees

For a number of years, the District worked with the Denver Classroom Teachers Association ("DCTA") and various school representatives on implementing a system of site-based management in which more responsibility for decision-making was accorded to the school site.

The concept of Collaborative Decision–Making Committees ("CDM's")—the name of the site-based management groups that are now operating throughout the District—grew out of those discussions and later discussion held by the District with the Governor of the State of Colorado, the Executive Director of the Department of Labor, and the DCTA. The composition and function of the CDM's were delineated in the collective bargaining agreement between the District and DCTA that went into effect on January 1, 1991 (the "Agreement").

The composition of the CDM's is governed by Article 5 of that Agreement. Under the Agreement, membership is to "represent the diversity of the school population to the extent possible."

Initial composition of the committee was to include: (i) the principal of the school; (ii) four teachers, chosen by vote of the faculty; (iii) three parents or community representatives, nominated by members of the school-based PTSA and/or other parent or community organizations, but elected by the majority of voting parents who have children in the school; (iv) one classified employee, chosen by vote of the classified employees at that site; (v) one business/employer representative, designated by the Commissioner of Education from names submitted by the business community; and (vi) in middle and high schools, two student representatives selected by the middle school.

Under the Agreement, after March 1, 1992, subject to the approval of the Superintendent, the CDM Committee at any school was permitted to expand the composition or make-up of its committee. The Agreement left to the schools the establishment of a fair system for selecting representatives.

While racial/ethnic membership on a number of the CDM committees is different from that existing within the student population of

the school, the disparities are not the result of action taken by the District.

On the most fundamental level, the District's ability to take action to encourage diversity on the CDM's is limited by the fact that many of the positions on the Committee are required to be elected by specific constituencies as opposed to being appointed by the District or the school. In addition, the philosophy behind the concept is one of site-based management, not centrally controlled management, thus limiting further the District's ability to intervene. As a result, while the District desires to improve minority representation on various CDM Committees, its ability to do so is limited.

The creation and operation of these site-based management groups may present problems for the Board. Such decentralization of authority could adversely impact the unitary character of the District in the future.

## CONCLUSION

This lawsuit began with denial—a refusal to believe what some perceived and the plaintiffs ultimately proved, that Denver schools were not providing equal educational opportunities to non-white children. For more than six years the parties to this action vigorously engaged in the adversarial process of charges and refutations. Regrettably, by its inherent nature, that process encourages the participants to emphasize and accentuate their differences. Court hearings divide and polarize the people whose interests are in conflict.

The lawyers appearing in this case and some of the leaders in the community have recognized these effects. They have worked diligently outside the courtroom to settle significant disputes and to heal the wounds inflicted by the past unlawful conduct and the more contentious aspects of remediation. The 1976 consent decree resulted directly from the efforts of many public spirited people in Denver, who understood and accepted the adjudicated need for desegregation of the school system.

During the intervening years, it has been necessary to return to the courtroom on occasions, again using the adversary process to resolve factual and legal issues. Each hearing generated expectations and disappointments. Public comment has been extensive. At times criticism became calumnious. Most of the public focus has been on forced busing—the crudest yet most common of the tools used in school desegregation.

This case has not been unique. It is but one of many such cases across the country. What is most common in the history of all of those cases is uncertainty. Thousands of pages have been written by scores of federal judges attempting to articulate guiding principles under the broad constitutional concept announced in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). What has been demonstrated most clearly is that courts using the adversary system were not designed to accomplish institutional reform. The Supreme Court has recognized in its most recent relevant opinions that the framers of the Constitution put their faith in the people and the democratic process to determine and provide for the general welfare.

The Denver now before this court is very different from what it was when this lawsuit began. The current Mayor of Denver is Black. His predecessor was Hispanic. A Black woman has been Superintendent of Schools. Black and Hispanic men and women are in the city council, the school board, the state legislature and other political positions. Business and professional leadership is multiracial. People of color are not bystanders. They are active players in the political, economic, social and cultural life of the community. Their influence has contributed to the enactment of legislation which will affect the future of public education, as shown in Appendix A. Their voices will be heard in the Denver school system. There is little danger that they will permit the public schools to deny them full participation.

Upon the foregoing, it is

ORDERED that the defendant's second motion to terminate jurisdiction is granted and full authority is restored to the District's Board of Education for governance of Denver's schools under applicable laws of the State of Colorado and the United States.

This civil action is, therefore, dismissed. It is further

ORDERED that the allegations of failure to comply with the Language Rights Consent Decree of August 17, 1984, made by plaintiff-intervenor Congress of Hispanic Educators, are removed from this civil action and will be dealt with as a separate and independent proceeding designated as Civil Action No. 95–M–2313, with its own jurisdictional base under the Equal Educational Opportunities Act of 1974, codified in 20 U.S.C. §§ 1701–1721 and particularly §§ 1703(f) and 1708.

## APPENDIX A

The District has identified the following state and federal statutes that apply to the operation of Denver's public schools.

### State Laws

Title 22 of the Colorado Revised Statutes contains the General Education Laws of the State of Colorado, including the following provisions:

Article 2. Establishes the State Board of Education, the Office of Commissioner of Education and sets forth their powers and duties.

Article 9. Contains the Certificated Personnel Performance Evaluation Act which establishes a provision for evaluation of certificated personnel and sets forth the duties of local boards of education in the evaluation process.

Article 20. The Exceptional Children's Educational Act which contains provisions regarding gifted children and children with disabilities.

Article 23. Education of migrate children.

Article 24. English Language Proficiency Act which establishes a program for English language proficiency.

Article 26. Gifted and talented students.

Article 27. Educational clinics for public school dropouts.

Article 28. The Colorado Preschool Program Act.

Article 30. The School District Organization Act.

Article 30.5. The Charter Schools Act.

Article 31. Establishes the process for election of School District Directors.

Article 32. Contains the powers and duties of School District Boards. Included within this article are the requirements that the School District have a written conduct and discipline code (22–32–109(1)(w)), mandatory procedures regarding assaults upon, disorderly conduct toward, harassment of or the making knowingly of a false allegation of child abuse directed toward a school teacher or a school employee or instances of damages occurring on the premises to the property of a teacher or employee (22–32–109(x)), and specific duties regarding the employment of personnel (22–32–109.7 and 109.8). Section 22–32–110 contains specific powers for the Board of Education, including mandatory provisions regarding student conduct and discipline (22–32–110(2)) and concerning the transportation of pupils pursuant to 22–32–113. Section 22–32–116.5 allows for the participation of students, who are nonresidents of the school district, in extracurricular and interscholastic activities.

Article 33. The School Attendance Law of 1963 provides for compulsory school attendance (22–33–104), home-based education (22–33–104.5), procedures for suspension, expulsion and denial of admission (22–33–105), grounds for suspension, expulsion and denial of admission of students (22–33–106), and for enforcement of compulsory school attendance (22–33–107).

Article 35. The Post–Secondary Enrollments Option Act.

Article 36. Public Schools of Choice Act.

Article 44. School District Budget Law.

Article 52. The Second Chance Program for problem students.

Article 53, Part 2. Concerns educational achievement and includes provisions for local goals and objectives in plans to approve educational achievement in graduation rates.

Article 53, Part 4. Education reform which provides for the adoption of content standards by school districts.

Article 54. The Public School Finance Act of 1994. (The ability of the School District to obtain revenues may further be limited by the "Taxpayers Bill of Rights" which is found in Article X, Section 20 of the Colorado Constitution.)

Article 60. Contains provisions regarding teacher certification.

Article 60.5. The Colorado Educator Licensing Act of 1991.

Article 61. Concerns teacher employment and contains a prohibition against discrimination on the basis of religion of religious affiliation of any person seeking employment and prohibits any contract with a teacher to require by inference or otherwise that the teacher become a member of, or belong to, any group or organization.

Title 24 of the Colorado Revised Statutes provides for the establishment of the Colorado Civil Rights Division and provides in Part 4 (24–34–401) that it is a discriminatory or unfair employment practice for an employer to refuse to hire, to discharge, or promote or demote, or to discriminate in matters of compensation against any person otherwise qualified because of disability, race, creed, sex, age, national origin, or ancestry.

*Federal Laws*

Federal laws which impact the operation of Denver Public Schools include the following:

Gun–Free School Zone Act of 1990, 18 U.S.C. § 921, *et seq.* Prohibits possession of unauthorized guns on school premises.

The Drug–Free Workplace Act of 1988, 41 U.S.C. § 701, *et seq.* Limits school a district's ability to receive grants unless it assures the provision of a drug-free workplace and programs respecting individual employees and the use of drugs or other controlled substances.

Federal Omnibus Transportation Employee Testing Act of 1991, 49 U.S.C. § 2717. Requires drug and alcohol testing of school transportation employees.

Individuals With Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* Provides for the education of children with disabilities.

Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.* Prohibits discrimination in employment based on disability and requires that public schools be made accessible to disabled persons.

Assignment or Transportation of Students, 20 U.S.C. § 1651, *et seq.* Contains prohibitions against school busing to overcome racial imbalance.

Equal Educational Opportunities and Transportation of Students, 20 U.S.C. § 1701, *et seq.* Provides that all children enrolled in public schools are entitled to equal educational opportunity without regard to race, color, sex, or national origin and establishes the neighborhood as the appropriate basis for determining public school assignments and contains provisions restricting the use of transportation of pupils to achieve racial balance.

Magnet Schools Assistance, 20 U.S.C. § 3021, *et seq.* Requires that a school district seeking funds for magnet school programs provide assurances that it will not discriminate based upon race, except to carry out an "approved plan," 20 U.S.C. § 3027(b)(4).

Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c, *et seq.* Contains provisions relating to complaints of discrimination in public schools based upon race, authorizes initiation of actions with respect thereto, and imposes limitations on actions or programs designed to overcome or to achieve racial balance in any school.

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* Prohibits exclusion from participation in, denial of benefits of, and discrimination under federally-assisted programs on the basis of race, color, or national origin.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Prohibits discrimination in employment because of race, color, religion, sex, or national origin.

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* Regulates pay and hours of work for school employees.

Family Educational Rights and Privacy Act, 20 U.S.C. § 1232(f), *et seq.* Regulates access to student records.

Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* Mandates employment leave for specified family and medical reasons.

Equal Access Act, 20 U.S.C. § 4071. Prohibits denial of equal access to school facilities on the basis of religious, political, philosophical, or other content of student speech.

Rehabilitation Act of 1974, 29 U.S.C. § 794, *et seq.* Prohibits discrimination against qualified individuals with disabilities with respect to programs or activities receiving federal financial assistance.

Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* Prohibits discrimination in employment based on age.

42 U.S.C. § 1981. Prohibits discrimination in making contracts on the basis of race.